En el Tribunal Supremo de Puerto Rico

| Partido de Acción Civil<br>Recurrido<br><br>V.<br><br>Comisión Estatal de Elecciones<br>Recurrente | Certiorari<br><br>99 TSPR 145 |
| --- | --- |

Número del Caso: CC-1999-142

Abogado de la Parte Peticionaria: Lcdo. Ramón L. Walker Merino

Abogado de la Parte Recurrida: Lcdo. Nelson Rosario Rodríguez

Tribunal de Primera Instancia, Sala Superior de San Juan

Juez del Tribunal de Primera Instancia: Hon. Zadette Bajandas Vélez

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Ortíz Carrión

Fecha: 9/27/1999

Materia:

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido de Acción Civil

    Demandante-Recurrido

        v.                   CC-1999-142       Certiorari

Comisión Estatal de Elecciones

    Demandado-Recurrente

Opinión del Tribunal emitida por el Juez Asociado señor FUSTER BERLINGERI

San Juan, Puerto Rico, a 27 de septiembre de 1999.

Nos toca resolver si un grupo de personas, en vías de inscribirse como partido político por petición, tiene derecho a obtener mediante pago copia de las listas electorales.

I.

El 26 de mayo de 1998, el llamado Partido de Acción Civil (PAC), una agrupación que está procurando obtener los endosos necesarios para quedar inscrita como partido por petición, solicitó a la Comisión Estatal de Elecciones (CEE) que le suministrara copia de las listas electorales, según definidas en el Art. 1.002 (21) de la Ley Electoral, 16 L.P.R.A. 3002. En específico, el PAC solicitó que

las listas se suministrasen en "CD rom o en cintas compatibles con los programas de Access o Excel". La CEE denegó esta solicitud pero le informó al PAC que podía examinar las listas en cuestión en la secretaría de dicho organismo.

Inconforme con esta determinación de la CEE, el 10 de junio de 1998, el PAC presentó una solicitud de revisión ante el Tribunal de Primera Instancia mediante la cual pidió que se revocara la determinación referida. Reiteró, además, su solicitud de que las listas electorales le fueran entregadas en CD rom o en cintas compatibles con los programas de informática Access o Excel.

El 10 de julio de 1998, el Tribunal de Primera Instancia dictó sentencia y concluyó que el PAC no tenía derecho a las listas referidas. Dictaminó que por constituir dichas listas parte del Registro Electoral, la CEE estaba impedida de suministrar copia de éstas a persona alguna, por disposición de la propia Ley Electoral. Posteriormente, sin embargo, ante una moción de reconsideración presentada por el PAC, el tribunal de instancia dictó sentencia enmendada el 16 de septiembre de 1998, y revocó su decisión anterior. Resolvió que conforme a lo resuelto en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., opinión de 21 de septiembre de 1995, 139 D.P.R. ___, 95 JTS 121, las listas electorales son documentos públicos y la CEE estaba obligada a proveer copia de éstas al PAC, una vez determinase su costo, si alguno.

La CEE, a su vez, solicitó reconsideración de dicha sentencia enmendada. El foro de instancia, mediante resolución emitida el 23 de noviembre de 1998, denegó la reconsideración. Reiteró que la lista final de electores es un documento público, distinto al Registro Electoral, y que conforme a ello, el PAC tiene derecho a dicha lista, por ser una persona con particular interés según la Ley Electoral.

Contra la sentencia enmendada y la resolución referida, la CEE presentó petición de certiorari ante el Tribunal de Circuito de Apelaciones. Mediante resolución emitida el 22 de enero de 1999, y notificada el 28 del mismo mes, el foro apelativo confirmó el dictamen del tribunal de instancia y adoptó por referencia los fundamentos formulados por éste. La moción de reconsideración presentada por la CEE fue declarada no ha lugar el 16 de febrero de 1999.

Ante la decisión adversa del foro apelativo, el 25 de febrero de 1999, la CEE interpuso el presente recurso ante nos y planteó lo siguiente como único señalamiento de error:

> Erraron tanto el TCA como el TPI al interpretar el Art. 1008 de la Ley Electoral y resolver que cualquier persona con particular interés tiene derecho, y la CEE viene obligada, a proveer copia de la Lista Final de Electores.

El 26 de febrero de 1999, emitimos una orden mediante la cual requerimos a la parte recurrida inter alia que expresara su punto de vista sobre los siguientes tres asuntos:

1) ¿Qué personas tienen interés suficiente para obtener las listas en cuestión?

2) ¿Qué información deben contener las listas referidas?, y

3) ¿Qué pago, si alguno, debe fijársele a los interesados para la obtención de dichas listas?

El 10 de marzo de 1999, la recurrida compareció mediante escrito en cumplimiento de orden. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

La CEE ha presentado varias alegaciones para justificar su posición de que el PAC no tiene derecho a las listas electorales en cuestión. Aduce la CEE que las listas que interesa el PAC forman parte integral del Registro Electoral y que por ello están sujetas a la prohibición en cuanto a su diseminación que la Ley Electoral dispone respecto al propio Registro Electoral. Más aun, alega la CEE que aun si dichas listas se pudiesen considerar como documentos públicos, y por tanto exentas de la prohibición aludida, no existe obligación de parte de la CEE de proveer copias de dichas listas a personas interesadas, ya que su obligación bajo la Ley Electoral se limita a permitir que tales listas sean examinadas por los interesados. Finalmente, aduce la CEE que el PAC como partido en proceso de inscripción no tiene el derecho a las listas electorales que tienen los partidos políticos inscritos.

No tiene razón la CEE en sus planteamientos. Veamos.

III.

Dos de las tres alegaciones formuladas ante nos por la CEE nos causan sorpresa.  Ello, porque se trata de asuntos que ya habíamos resuelto de modo claro en nuestra reciente decisión en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., supra. En dicha decisión señalamos, en primer lugar, que aunque las listas electorales se confeccionan mediante información que surge del Registro Electoral, dichas listas son distintas a éste, debido a que tienen un contenido mucho más limitado que el del Registro Electoral.  Concretamente señalamos lo siguiente en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E.:

> "Este Registro Electoral ... se trata de un registro o récord primario contentivo de **toda la información** relacionada con la inscripción de un elector en Puerto Rico.  Tiene el carácter de un expediente e incluye las peticiones de inscripción, las llamadas tarjetas electorales, además de otras formas de compilación de los datos contenidos en las peticiones.  Las peticiones de inscripción, a su vez, contienen la siguiente información personal del peticionario: (a) nombre y apellidos paterno y materno del peticionario; (b) nombre del padre y de la madre; (c) sexo, color de ojos y estatura; (d) lugar de nacimiento, indicando el municipio; (e) fecha de nacimiento; (f) si es ciudadano de los Estados Unidos; (g) estado civil, y de ser casado, el nombre y apellidos legales  de su cónyuge; (h)domicilio; (i) dirección postal; (j) firma o marca del peticionario o de la persona que lo haga a su ruego si éste no supiere firmar o no pudiere hacerlo; (k) copia del acta de nacimiento. ...
>
> De otro lado, nos parece razonable que la Comisión, al mismo tiempo que como custodio posee un récord de toda la información personal relacionada con cada elector, **tenga disponible además un listado más sencillo con el propósito de ser utilizado en la mecánica de los procesos electorales**". (Enfasis suplido).

Este "listado más sencillo" aludido antes es, como señaláramos expresamente en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., supra, la llamada "Lista Final de Electores" que sólo contiene información relativa al nombre, dirección, y número de tarjeta electoral del elector inscrito así como el precinto y unidad electoral al cual éste pertenece.

En segundo lugar, en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., supra, resolvimos de manera expresa y patente que el legislador de manera justificada había querido proteger la intimidad del elector al prohibir que se suministrara copia del Registro Electoral a persona alguna. Sin embargo, resolvimos de igual modo que el listado más sencillo antes aludido, la llamada "Lista Final", era, en cambio, un documento público, por disposición de la propia Ley Electoral[1] y que "la difusión

---

[1] El Art. 1.008 de la Ley Electoral dispone que:

Salvo que otra cosa se disponga en esta ley, todos los récords, escritos, documentos, archivos y materiales de la Comisión serán considerados como documentos públicos y podrán ser examinados por cualquier comisionado o persona interesada. No obstante en lo antes dispuesto, y salvo lo que más adelante se dispone para las papeletas de muestra o modelo, la Comisión no suministrará o proveerá a persona alguna copia del Registro Electoral o de las tarjetas de identificación electoral, papeletas, actas de escrutinio o las hojas de cotejo oficiales que hayan de utilizarse en una elección. Las peticiones de inscripción serán consideradas documento privado y solamente podrán solicitar copias de las mismas el inscrito o su representante, los Comisionados Electorales, la Comisión Estatal de Elecciones y sus organismos oficiales o cualquier Tribunal de Justicia que en el desempeño de sus

pública de las listas de votantes en el contexto del proceso electoral" e incluso la entrega de dicha lista a personas interesadas, no infringía el derecho a la intimidad de los electores.   En particular, aprobamos en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., supra, que este listado sencillo fuese vendido al Partido Demócrata de Puerto Rico.   Señalamos entonces que:

> Las listas que el Presidente de la CEE autorizó vender al Partido Demócrata son similares a las que [la Ley Electoral]... ordena a la Comisión entregar a cada partido político local con sesenta días de anticipación a las elecciones generales y que son ampliamente distribuidas en los procesos electorales.  No se trata, como alega la parte apelante, de la venta del Registro Electoral con el historial personal de cada elector que está vedada por la Ley Electoral.  Por lo tanto, fue correcta la determinación del tribunal de instancia al desestimar el planteamiento de ilegalidad de la venta.

En efecto, la propia Ley Electoral delega en el Presidente de la CEE la facultad de vender los impresos que prepare o mande a imprimir la CEE. Art. 1.011(h) de la Ley Electoral, 16 L.P.R.A. 3007(h). A tenor con esta facultad, la CEE estableció un Reglamento para la venta de documentos, materiales e impresos de naturaleza electoral, aprobado el 5 de junio de 1990. En dicho reglamento, se dispone que los

---

> funciones a tenor con las disposiciones de esta ley lo requiera.
>
> Los Comisionados Electorales tendrán derecho a solicitar copia de los documentos de la Comisión y éstos se expedirán libre de costo y dentro de diez (10) siguientes a la solicitud.

16 L.P.R.A. 3016.

siguientes documentos estarán disponibles para la venta al público:

1. Leyes Electorales

2. Mapas electorales, fotocopias de libros, folletos, dibujos, planos, papeletas modelo **y documentos no exceptuados por este Reglamento o por la Ley Electoral de Puerto Rico.**

3. Publicaciones tales como: reglamentos o libros de estadísticas.

4. Cinta magnetofónicas, video cintas, películas, fotografías que no sean retratos ni negativos de los electores tomados al cumplimentar una petición de inscripción.... (Enfasis suplido).

En resumen, pues, a la luz de nuestra decisión en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., supra, y de la legislación y reglamentación citadas antes, es evidente que no tiene razón la CEE al alegar que las listas electorales no pueden ser diseminadas públicamente, y al alegar que no tiene autoridad para vender dichas listas. Pasemos entonces a considerar si entidades como el PAC tienen derecho a adquirir tales listas, como pudo hacerlo antes el Partido Demócrata de Puerto Rico.

IV.

La CEE argumenta que la decisión en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., supra, es distinguible del caso de autos porque allí se trataba de un partido político ya inscrito, mientras que aquí se trata de un partido en proceso de inscripción. Alega que suministrarle copia de las listas al PAC sería equipararlo a

un partido político. No tiene razón la CEE. Nótese, en primer lugar, que la propia Ley Electoral le da acceso a los documentos públicos de la CEE a **"cualquier persona interesada"**. Tal designación evidentemente incluye grupos como el PAC que necesitan dichas listas para poder llevar acabo eficazmente la legítima labor de inscribir su entidad como nuevo partido político por petición.

Además, desde 1960 hemos reconocido el interés particular, de origen constitucional, que poseen los partidos en vías de inscripción. En Dávila v. Superintendente, 82 D.P.R. 264 (1960), resolvimos que estos partidos tienen un interés especial, distinto del interés general que pueda tener cualquier ciudadano. A pesar de que Dávila v. Superintendente, supra, fue resuelto bajo la anterior Ley Electoral, nuestras expresiones allí sobre el interés de los partidos en proceso de inscripción continúan teniendo vigencia hoy día:

> Su interés de inspeccionar y **copiar las listas** [...] no es producto de la mera curiosidad o del deseo de entorpecer las labores de un organismo oficial, sino que nace de sus responsabilidades como organizadores y directores de un partido político en proceso de inscripción y se asienta, por consiguiente, en el derecho fundamental a la selección de candidatos y a la organización electoral protegido plenamente por la Constitución y las leyes del país y que constituye una de las garantías básicas de la democracia política. (Enfasis suplido).

Id, a la pág. 275.

Es evidente que, al amparo de la Constitución de Estados Unidos así como de nuestra propia Constitución, las

agrupaciones políticas nuevas tienen derecho a procurar medios razonables para convertirse en partidos para fines electorales, tanto bajo el derecho fundamental al voto como del derecho fundamental de asociación. Ello, porque de otra forma una parte del electorado se vería privado de ejercer su derecho al voto y su derecho a organizarse políticamente. Sobre el particular, el Tribunal Supremo de Estados Unidos ha resuelto que:

> A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties. **By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas**. Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. **In short, the primary values protected by the First Amendment-"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)— are served when election campaigns are not monopolized by the existing political parties**. (Enfasis suplido).

Anderson v. Celebrezze, 460 U.S. 780, 793-94 (1983). Véase también, Norman v. Reed, 502 U.S. 279 (1992); Illinois Bd. v. Socialist Workers Party, 440 U.S. 173 (1979); Williams v. Rhodes, 393 U.S. 23 (1968).

De modo similar, al amparo de la Constitución del Estado Libre Asociado de Puerto Rico, nosotros mismos hemos

reconocido lo siguiente, en P.R.P. v. E.L.A., 115 D.P.R.

631, 637-640 (1984):

> Hoy en día no se discute cómo las Secs. 1 y 2 de la Carta de Derechos le imponen a la Asamblea Legislativa unas limitaciones al ejercicio de su amplia facultad para reglamentar la formación de los partidos políticos. ...

> El principio igualitario expuesto intenta disuadir que en determinada época un partido, que controla mayoritariamente los poderes ejecutivo y legislativo, o lo comparta con otro -mediante anuencia o consenso- limite el nacimiento de otros partidos. ...

> Como principio general aquella legislación que tienda a hacer onerosa y afectar negativa y sustancialmente las potencialidades de los partidos contrarios minoritarios o los partidos nuevos, o a crear situaciones de inferioridad, puede ser susceptible de impugnación constitucional.

> La justificación de este enfoque es evidente. En nuestra democracia los partidos políticos son indispensables para su funcionamiento Están investidos de poderes cuasi gubernamentales. Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. Como tales, formulan programas de administración y promueven candidatos a puestos políticos.

> ... Los partidos políticos son movimientos que aglutinan intereses ciudadanos. El respaldo necesario para inscribir y conferir franquicia oficial a un partido por petición, de por sí es suficiente para que surta efecto plenario esa condición. Negar *ab initio* esa igualdad es rehusar reconocer esa realidad.

Por otro lado, en virtud del principio de igualdad

electoral inmerso en nuestra Constitución, P.P.D. v.

Gobernador I, opinión de 22 de diciembre de 1995, 139 D.P.R.

___, 95 JTS 165; P.R.P. v. E.L.A., supra, la CEE tendría que

demostrar que existe un interés preeminente del Estado que

justifique negarle al PAC lo que ya antes de concedió al Partido Demócrata.  La CEE no ha señalado tal interés, y no creemos que éste existe.  Igual que lo ha hecho el Tribunal Supremo de Estados Unidos, consideramos que constituye una violación a la igual protección de las leyes, que sin una justificación apremiante se le dé a una agrupación política en proceso de inscripción un trato desigual al otorgado a un partido ya inscrito respecto a asuntos como el que aquí nos concierne.  Para sostener una medida que restrinja el acceso a la papeleta de un nuevo partido político, el Supremo federal ha requerido la demostración de

> "a corresponding interest sufficiently weighty to justify the limitation [and] any severe restriction to be narrowly drawn to advance a state interest of compelling importance. Norma v. Reed, supra, a la pág. 288-89.

Tal demostración también es requerida por nuestra propia Constitución, y la CEE no la ha hecho.  Por el contrario, el PAC, como partido político en vías de inscripción, tiene un interés legítimo en obtener copia de una lista electoral similar a la que la Comisión entrega a cada partido político inscrito con anticipación a las elecciones generales. Art. 5.013, 16 L.P.R.A 3212a; y sobre todo, **similar a la que la CEE vendió al Partido Demócrata**, con nuestra aprobación en Damaris Mangual, Comisionada Electoral del P.I.P. v. C.E.E., supra. Esta lista solamente contiene información relacionada al nombre, dirección, número de tarjeta electoral, precinto y unidad electoral del votante. Resolvemos, pues, que la CEE debe proveer al PAC copia de la lista solicitada, una vez

determine y obtenga el pago de su costo razonable de acuerdo al procedimiento ya establecido para la venta de documentos electorales.

V.

Por los fundamentos expresados antes, procede que se expida el recurso y se confirme la sentencia dictada por el Tribunal de Circuito de Apelaciones. Se dictara sentencia de conformidad.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido de Acción Civil

    Demandante-Recurrido


        v.                    CC-1999-142        Certiorari

Comisión Estatal de Elecciones

    Demandado-Recurrente


SENTENCIA


San Juan, Puerto Rico, a 27 de septiembre de 1999.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente, se expide el recurso y se confirma la sentencia dictada por el Tribunal de Circuito de Apelaciones.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García concurre con opinión escrita.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido de Acción Civil

   Demandante-Recurrido

                         CC-1999-142            Certiorari
      v.

Comisión Estatal de
Elecciones

   Demandado-Recurrente


Opinión Concurrente del Juez Asociado señor Negrón García


San Juan, Puerto Rico, a 27 de septiembre de 1999


     **Protagonizamos un verdadero triunfo de la Democracia sobre la Partidocracia.** La decisión de entregar las listas electorales al grupo de ciudadanos auto denominado **Partido de Acción Civil** (P.A.C.), es un imperativo de nuestro esquema constitucional electoral apuntalado en el principio rector de gobierno por consentimiento de los gobernados.

     Tal entrega está avalada en su incuestionable interés <u>bona fide</u> de participar en los **procesos electorales legítimos dentro del diseño**

**constitucional que rige al país,**[2] **no en la extraña farsa que representan las llamadas primarias presidenciales** en que participan unos "partidos **locales** demócratas y republicanos", que no son otra cosa que criaturas **creadas artificialmente e impuestas** por la Asamblea Legislativa mediante la Ley Núm. 6 de 24 de septiembre de 1979, según enmendada, (nótese el apellido **"compulsorias"**), <u>alter egos</u> de los líderes principales de los partidos Partido Nuevo Progresista (P.N.P.) y Partido Popular Democrático (P.P.D.).

   **Sabido es que esas primarias presidenciales, obligatorias constituyen unos eventos <u>extra constitucionales</u> en que el valor del voto no se cuenta en el momento crucial.** Son únicamente para expresar las preferencias sobre candidatos potenciales a ser subsiguientemente nominados por los "partidos nacionales demócratas y republicanos" en los Estados Unidos. **Se "vota" por unos delegados quienes sólo podrán endosar posibles candidaturas a los cargos de Presidente y Vicepresidente de los Estados Unidos; a la postre, el voto de los electores emitido en Puerto Rico carece de todo valor, eficacia y <u>contabilidad comicial real</u>, pues no tienen derecho a votar y, por ende, no eligen a ningún Presidente o Vicepresidente norteamericano.** En la práctica, son "encuestas" proselitistas pagadas con

---

[2] Nuestra Constitución se cimenta en una democracia, sistema de gobierno que proclama, viabiliza y desparrama a través de numerosas de sus disposiciones.

fondos públicos en beneficio de los dos (2) partidos principales (P.N.P.) y (P.P.D.), para pulsar sus respectivas fuerzas con miras a las elecciones generales y, además, para usarlas de trampolín o plataforma de lanzamiento para penetrar y lograr acceso a las altas esferas en Washington y posibles candidatos presidenciales.

Para la justa visualización del reconocimiento de este derecho al P.A.C., imprescindible recordar la razón específica que animó nuestro disenso en Damaris Mangual v. Comisión Estatal de Elecciones, res. en 21 de septiembre de 1995.

I

En Damaris, supra, el Partido Independentista Puertorriqueño (PIP) se opuso a la entrega de las listas electorales que solicitaba el Partido Demócrata "local" para su reorganización interna, antes de la celebración en la isla de las aludidas primarias "presidenciales". Al igual que en otros años, esas primarias "presidenciales", sufragadas con el dinero de todos los contribuyentes,[3] pretendían movilizar a la ciudadanía hacia una actividad política sectaria y proselitista que sólo promovía, como último fin político, la unión permanente con los Estados Unidos a través de la estadidad o el Estado Libre Asociado.

Por múltiples fundamentos, allí ratificamos nuestro inalterable criterio —originalmente expuesto en P.S.P. v. E.L.A., 107 D.P.R. 590 (1978), ratificado en P.I.P. v. E.L.A., 109 D.P.R. 335 (1980); P.I.P. v. E.L.A., 109 D.P.R. 403 (1980); y P.I.P. v. Comisión Estatal de Elecciones, 120 D.P.R. 580 (1988)–, de que la definición, imposición y celebración de tales primarias presidenciales es un mandato legislativo **inconstitucional** pues representan el desembolso ilegal de fondos públicos y discriminan directamente contra los sectores políticos opuestos a la integración de Puerto Rico a los Estados Unidos (ideario

---

[3] El Art. VI Sec. 9 de nuestra Constitución preceptúa, en lo pertinente que "sólo se dispondrá de las propiedades y fondos públicos y para el sustento y funcionamiento de las instituciones del estado y en todo caso por autoridad de ley."

Obviamente la legitimidad de cualquier desembolso público depende de que la "ley que lo autoriza" sea constitucionalmente válida.

independentista); deslinde que permite la fácil identificación de los que lo promulgan. La oposición del P.I.P., a la entrega de las listas electorales era comprensible y justificada por la triste realidad histórica de la práctica deleznable de la policía, -precisamente bajo las administraciones del P.P.D. y P.N.P.-, de confeccionar y conservar indiscriminadamente, listas y carpetas de personas que no comulgaban con sus ideologías. Cf. Noriega Rodríguez v. Hernández Colón, res. en 30 de junio de 1992; Noriega v. Hernández Colón, 122 D.P.R. 650 (1988).

Por ende, nos rehusamos entonces avalar la posición

mayoritaria del Tribunal de permitir la compraventa de las listas electorales, ya que, aparte de la inconstitucionalidad de ese esquema primarista estatutario, ello configuraba una particular afrenta al derecho constitucional a la intimidad de los electores independentistas que se oponían al ejercicio obligado primarista de unos partidos "locales" norteamericanos ficticios de creación legislativa.

## II

**El trasfondo de hechos al que nos enfrentamos hoy es totalmente distinto.** El P.A.C., ciudadanos agrupados tiene el sólo propósito de legalmente figurar en la papeleta electoral de nuestras próximas elecciones generales.

Sin embargo, la Comisión Estatal de Elecciones, –por unanimidad de los comisionados de los tres (3) partidos principales–, les negó las listas electorales aún cuando el P.A.C. adujo lo evidente: **dicha negativa torna el proceso y requisito de inscripción (presentar 97, 874 endosos), en uno muy oneroso y lento, que <u>de facto</u> dificulta y restringe su derecho a inscribirse a tiempo como partido por petición, en menoscabo del ejercicio al sufragio.**

La entrega que en <u>Damaris</u>, entrañaba una violación a la citada Sec. 9 Artículo VI de nuestra Constitución, así como al derecho de intimidad de los electores independentistas; **situación que no está aquí presente.**

Adviértase que, la obtención de las listas por parte del P.A.C. persigue un preciado fin legítimo electoral, y no es producto de la mera curiosidad ni tiene propósitos comerciales. **No conforma otro afán que no sea el ejercer su innegable derecho a organizarse, inscribirse y obtener una franquicia como partido político en Puerto Rico.** <u>Dávila</u> v. <u>Superintendente</u>, 82 D.P.R. 264 (1960).

Repetimos, la meta de figurar en la papeleta electoral como opción político partidista en las próximas elecciones puertorriqueñas es el elemento decisorio determinante. Está apuntalada en el derecho que tiene nuestro pueblo a organizarse en grupos de opinión, con carácter

de partidos políticos, cuya génesis se funda en el derecho al sufragio; **consustancial con la existencia y vitalidad misma de una genuina democracia política**. <u>Giménez</u> v. <u>J.E.E.</u>, 96 D.P.R. 943 (1968).


ANTONIO S. NEGRÓN GARCÍA
Juez Asociado