En el Tribunal Supremo de Puerto Rico

| Partido Acción Civil<br>    Peticionario<br><br>               V,<br><br>Estado Libre Asociado de Puerto Rico<br>    Recurridos | Apelación<br><br>99 TSPR 163 |
| --- | --- |

Número del Caso: AC-1999-20

Abogado de la Parte Peticionaria:  Lcdo. Nelson Rosario Rodríguez

Abogado del ELA: Oficina del Procurador General
                 Lcdo. Roberto Cruz

Abogado de la Comisión Estatal Elecciones: Lcdo. Ramón L. Walker Merino

Abogado del Comisionado Electora del PNP: Lcdo. José A. Carlo Rodríguez

Tribunal de Circuito de Apelaciones: Circuito Regional I, Panel III

Juez Ponente: Hon. Guillermo Arbona Lago

Fecha: 27/10/1999

Materia: Sentencia Declaratoria

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correciones del
proceso de compilación y publicación oficial de las
decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Acción Civil

   Peticionario

     v.                            AC-1999-20

Estado Libre Asociado
de Puerto Rico

   Recurridos

RESOLUCION

San Juan, Puerto Rico, a 27 de octubre de 1999.

A la segunda solicitud de auxilio de jurisdicción de los peticionarios, no ha lugar.

Notifíquese por la vía telefónica y ordinaria.

Lo acordó el Tribunal y certifica la Subsecretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió un Voto Disidente, al que se unió el Juez Asociado señor Fuster Berlingeri. La Juez Asociada señora Naveira de Rodón , en auxilio de la jurisdicción de este Tribunal, proveería el remedio solicitado por los peticionarios para que no se tornare académico el trámite de inscripción del Partido Acción Civil.

Carmen E. Cruz Rivera
Subsecretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido de Acción Civil

    Demandante-Peticionario

       v.                          AC-1999-20

Estado Libre Asociado de P.R.;
Comisión Estatal de Elecciones
y otros

    Demandados-Recurridos

Voto Disidente del Juez Asociado señor Negrón García al cual se une el Juez Asociado señor Fuster Berlingeri

San Juan, Puerto Rico, a 27 de octubre de 1999

**Tristemente prevalece la Partidocracia frente a la Democracia. Ninguno de los partidos políticos principales que hoy existen —en orden cronológico de inscripción, Partido Popular Democrático (P.P.D.), Partido Independentista Puertorriqueño (P.I.P.), y Partido Nuevo Progresista (P.N.P.)—, obtuvieron su franquicia y entraron al escenario electoral con el requisito legislativo de "exclusividad de juramento ante notario".**

**"Nadie sostendría que se deben poner obstáculos indebidos en el camino de un movimiento político nuevo y responsable que desee incluir sus candidatos en la papeleta electoral para que el público los**

evalúe. Por otro lado, ningún observador político serio defendería el derecho de los 'partidos' frívolos y oportunistas a confundir la papeleta y el electorado. El problema es determinar si el miedo de los que se oponen [a los partidos nuevos], porque esto amenazaría la agradable 'estabilidad' del actual sistema, está justificado." M. Pabón, <u>Los Derechos y los Partidos Políticos en la Sociedad Puertorriqueña</u>, Ed. Edil, San Juan, 1968, pág. 110.

Para evitarlo, debimos con carácter urgente, vía reconsideración y en auxilio de jurisdicción, autorizar la suscripción de peticiones de inscripción —además de ante notarios públicos–, por funcionarios de la Comisión Estatal de Elecciones adscritos a las Juntas de Inscripción Permanente.

I

Desde el año pasado la agrupación ciudadana **Partido de Acción Civil (P.A.C.)**, intenta inscribirse como "partido por petición" y participar en las elecciones generales del 2000. El 6 de octubre de 1998, solicitó del Tribunal de Primera Instancia, Sala Superior de San Juan, decreto de inconstitucionalidad de los Arts. 3.001 (3) y 3.002 de la Ley Electoral,[1] e injunction preliminar y permanente contra los demandados, Comisión Estatal de Elecciones, <u>et al.</u> ordenándoles cesaran de exigirle cumplir con ciertos requisitos establecidos en dichas disposiciones. También pidió medidas remediales judiciales conducentes a que se le aplicase el proceso de inscripción fijado para la presentación de candidaturas en las **primarias internas** de los partidos políticos inscritos.

Los demandados, Comisión Estatal, <u>et al.</u>, levantaron varias defensas y solicitaron la desestimación de la demanda. Argumentaron, que el **P.A.C.** carecía de legitimación activa por no ser partido político; que ella tenía jurisdicción exclusiva sobre el asunto; que el escrutinio judicial era el nexo racional, no el estricto; que inscribir

---

[1] Núm. 4 de 20 de diciembre de 1977, según enmendada. (16 L.P.R.A. secs. 3101(3) y 3102).

un partido político no era un derecho fundamental y; que no se había configurado una violación a la cláusula constitucional sobre la igual protección de las leyes por ideología política, pues todas las agrupaciones similarmente situadas que desean inscribirse tenían que satisfacer idénticos requisitos.

Luego de varios trámites procesales, el 21 de enero de 1999, el Tribunal de Instancia (Hon. Carmen Rita Vélez Borrás) desestimó sumariamente la demanda. Sostuvo la constitucionalidad de los preceptos impugnados en virtud de un análisis sobre el nexo racional de los distintos requisitos, concluyendo que responden a intereses válidos y legítimos del Estado. Determinó que el **P.A.C.** no podía exigir un trato igual al de los partidos inscritos para sus primarias internas.

En apelación, el Tribunal de Circuito de Apelaciones (Hons. Arbona Lago, Brau Ramírez y Urgell Cuevas) confirmó. Ante nos, el **P.A.C.** reproduce sus planteamientos. Específicamente discute que las exigencias sobre la juramentación de los endosos **exclusivamente ante notarios públicos**, y su presentación a la Comisión a más tardar siete (7) días después, son imposibles de cumplir y entrañan un discrimen irrazonable. Aduce que es imposible conseguir notarios dispuestos a juramentar endosos a tiempo completo por el período de tiempo necesario que implica conseguir más de 97,000 endosos.

Argumenta el trato diferencial otorgado al grupo **PRO-ELA**, en virtud de la Ley Núm. 249, del 17 de agosto de 1998 –habilitadora del proceso plebiscitario del 13 de diciembre de 1998–, al cual se le brindó acceso a la papeleta y al Fondo Electoral con la sola recolección de 2,300 endosos, sin la exigencia de **juramentación sólo ante notario**. La Ley Núm. 249 en su Art. 10(3) disponía para la firma de peti-ciones "ante los funcionarios autorizados por ley a tomar juramentos y, por aquellos a los que la Comisión autorice para ello." También, nos llama la atención al Reglamento para los Procesos de Radicación de Candidaturas y Primarias de los Partidos Políticos, el cual establece que las peticiones de primarias se pueden juramentar,

además de los funcionarios autorizados en ley para ello, ante **cualquier elector** que estampe su firma y provea su número electoral.

II

Nuestra democracia se enraíza en que "el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas". Preámbulo, Constitución E.L.A. El derecho a participar y votar en el proceso electoral, es consustancial a la libre expresión y libertad de asociación. Ortiz v. Barreto, 110 D.P.R. 84 (1980). La visión amplia de nuestra democracia significa que el ejercicio al sufragio no sólo implica acceso individual a las urnas sino que –con sujeción a ciertas limitaciones razonables necesarias–, se incluyan en las papeletas opciones que reflejen las ideas y concepciones del elector de una sociedad pluralista. A su vez, la libertad de asociación conlleva el derecho a formar agrupaciones y proponer candidatos de su predilección para participar en el proceso electoral. P.S.P. v. C.E.E., 110 D.P.R. 400 (1980); García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49 (1976).

No obstante, estos valores no se implementan en términos absolutos. Hoy día nadie cuestiona seriamente la facultad de la Asamblea Legislativa para reglamentar estos derechos. **Sin embargo, el igual trato es requisito sine qua non para validar el proceso mismo.** Giménez v. J.E.E., 96 D.P.R. 943 (1968). No puede legislarse contra el axioma de igualdad electoral inmerso en nuestra Constitución, que prohibe el que en determinada época un partido, que controla mayoritariamente los poderes ejecutivo o legislativo, o lo comparta con otro –mediante anuencia o consenso– limite la génesis de otros partidos. P.R.P. v. E.L.A., 115 D.P.R. 631, 638 (1984). Por ende, toda legislación que de su faz o en la práctica, tienda a hacer irrazonablemente onerosa e inhibir sustancialmente el nacimiento de partidos nuevos, o a crear situaciones de inferioridad, **está sujeta a un análisis bajo el escrutinio judicial estricto.** Si lesiona el derecho

al voto, asociación e igualdad electoral, e injustificada e irrazonablemente inmola el principio igualitario que debe regir en cualquier proceso electoral **manteniendo o introduciendo** reglas distintas y más onerosas –disminuyendo así el potencial real del ciudadano a organizarse para colectivamente participar en el proceso político (sin que el Estado pueda oponer y demostrar interés apremiante)– nuestra responsabilidad judicial es descartarla en abono de los preciosos derechos constitucionales envueltos.

Enmarcada en esta brevísima exposición, no tenemos duda que la meta del **P.A.C.** de figurar en la papeleta electoral como opción político partidista en las próximas elecciones está amparada por el derecho constitucional que tienen los ciudadanos a organizarse colectivamente en grupos de opinión, amén del derecho a presentar sus propios candidatos. Como tal, no cabe cuestionar seriamente su legitimación activa –P.A.C. V. Comisión Estatal, res. en 27 de septiembre de 1999–, como tampoco que no estemos ante unos planteamientos de derecho puro, sobre los cuales prevalezca la contención de la Comisión Estatal reclamando jurisdicción original exclusiva. **La naturaleza fundamental de los derechos envueltos y el factor apremiante del tiempo, conlleva que evaluemos expeditamente los méritos del recurso a través del escrutinio judicial estricto.**

III

El Art. 3.001 (3) de la Ley Electoral establece:

> "Se considerará como 'Partido por Petición' a cualquier agrupación de ciudadanos que, con el propósito de figurar en la papeleta electoral de unas elecciones generales, en o antes del primero de junio del año de elecciones se inscriba como partido político, mediante la radicación ante la Comisión de peticiones juradas al efecto, **ante notarios públicos admitidos al ejercicio de la notaria**,..., quienes percibirán de la Comisión Electoral un (1) dólar por cada petición notarizada válida como honorarios, suscritas por un número de electores no menor del cinco (5) por ciento del total de votos depositados para todos los candidatos al cargo de Gobernador en la elección precedente...."

**El requisito de exclusiva juramentación de peticiones de endoso ante notario público es de época reciente, impuesto por la Ley Núm. 4**

**de 15 de noviembre de 1978.** Según su historial legislativo respondió al interés de salvar la omisión involuntaria de que en el trámite de aprobación de la Ley Electoral de 1977 no se proveyó para la juramentación de peticiones de inscripción de partidos políticos. **La intervención única del notario** se justificó a base de la percepción de la Asamblea Legislativa de "cumplir **con una tradición** en nuestro proceso de inscripción de partidos por petición". (Informe Cámara de Representantes, 24 de octubre de 1978).

Varios problemas graves surgen en la implementación del requisito de **"exclusividad de juramento ante notario". Primero,** un estudio de la trayectoria de Ley Electoral original del 1919 hasta el Código Electoral de 1974 y la Ley Electoral de 1977, no avala la conclusión legislativa y existencia de esa "tradición".

Bajo la Ley Núm. 79 de 25 de junio de 1919 los endosantes declaraban bajo juramento **"ante algún funcionario autorizado por ley para tomar juramentos"**, que habían firmado la petición y eran electores debidamente inscritos y capacitados para votar.[2] En el 1924 fue enmendada para que el juramento fuera **"ante un funcionario judicial de Puerto Rico autorizado para tomar juramentos"**.

---

[2] La propia ley contenía una disposición para agilizar el trámite consignado que **"no ser[í]a necesario presentar una declaración jurada por separado para cada firmante, pero la certificación del funcionario deberá comprender a todos y cada uno** de los firmantes que suscriban la petición". (Este texto se mantuvo inalterado en las leyes Núms. 15 y 74 de 12 de mayo de 1920 y 30 de julio de 1923, respectivamente).

La Ley Núm. 2 de 18 de junio de 1924 disponía ante funcionario judicial autorizado para tomar juramentos; haría constar en su certificado el hecho que el juramento y la firma o la impresión judicial fueron en su presencia y observación y deberá haber un certificado por separado para cada juramento y firma. (Estas disposiciones permanecieron igual en las leyes Núms. 74, 114, 10, 87, y 1 de 6 de julio de 1932, 29 de junio de 1936, 18 de agosto de 1952, 20 de junio de 1955 y 2 de septiembre de 1955, respectivamente).

La Ley Núm. 140 de 30 de junio de 1961, estableció que sería jurada ante el Presidente de Junta Local de Elecciones del Precinto del elector, Juez Superior, de Distrito o de Paz. La Ley Núm. 3 de 5 de octubre de 1965 añadió a estos funcionarios el "notario público nombrado por la Junta Estatal de Elecciones".

Luego, en 1961 la petición era jurada **ante el Presidente de la Junta Local de Elecciones del Precinto del cual sea elector el peticionario, o ante un juez superior, de distrito o de paz.**

Finalmente en 1965 la petición podía ser jurada **ante el Presidente de la Junta Local de Elecciones del Precinto del cual sea elector el peticionario, ante un juez superior, de distrito o de paz, y <u>por primera vez</u> ante notario público <u>nombrado</u> por la Junta Estatal de Elecciones.**

Distinto a la visión legislativa, no existe la tradición de **"exclusividad notarial"** hasta el 1978. De hecho, la realidad legal había sido otra, más amplia, jurar ante cualquier funcionario autorizado por ley y jueces, visión que se cambió en la década de 1960 para añadir a Presidentes de la Junta Local de Elecciones.

**Segundo**, ciertamente la imposición legislativa de que **sólo ante notarios** puedan juramentarse las inscripciones, representa una clara limitación frente a la verdadera norma tradicional de funcionarios autorizados por ley a tomar juramentos, incluso las alternativas de jueces y Presidentes de Juntas Locales. Adviértase el amplio potencial de disponibilidad de estos funcionarios a través de la isla que ejercen tarea completa por sus distintos cargos en oficinas públicas de fácil acceso.

**Tercero**, no se necesita mucho esfuerzo mental para entender las dificultades que entraña reclutar únicamente abogados notarios para que, por la módica suma de $1.00 por petición, echen a un lado la práctica de la abogacía y concentren sus labores en este tipo de actividad inscripcionaria. Recuérdese también la responsabilidad que esos notarios tienen de radicar en la Secretaría de la Comisión Estatal unos informes notariales cada quince (15) días –conteniendo una relación de las peticiones de inscripción que han notarizado (Sec. 3.3 del Reglamento para la Inscripción de Partidos por Petición)–, y labor extra que conlleva a preparar sus Registros de Testimonios e Índices Mensuales y Anules requeridos por la Ley Notarial.

**Cuarto**, la norma de **"exclusividad notarial"** se torna inevitablemente más onerosa cada cuatrienio en virtud de la fórmula legal que requiere que el número total de peticiones de endosos para inscribir un nuevo partido sea una cantidad no menor del **"cinco (5) por ciento del total de votos depositados para todos los candidatos** al cargo de Gobernador en la elección general precedente". Nos explicamos.

Los Informes Oficiales Sobre los Resultados de las Elecciones Generales durante el período comprendido entre los años 1972-1996, revelan un aumento promedio de 114,902 por elección en los votos emitidos para dicho cargo. El resultado de esta tendencia es un incremento en el número de peticiones necesarias en virtud de ese cinco (5%) por ciento. De su faz no detectamos defecto constitucional alguno. Ciertamente la Asamblea Legislativa puede exigir una demostración de apoyo y endoso ciudadano –razonable y proporcional– para alcanzar y entrar como partido político al escenario electoral.

Ahora bien, esa **entrada** resulta más gravosa al compararla con el trato que la Ley Electoral brinda para **permanecer inscrito como partido principal y no perder la franquicia.** Nos referimos a la enmienda introducida a la Sec. 3101 (1) –Ley Núm. 3 de 10 de enero de 1983–, que como una de las alternativa,[3] **redujo** a un tres por ciento (3%) del total de "papeletas íntegras" depositadas para todos lo partidos para continuar partido principal. Nótese, no sólo que ese por ciento varía, sino que incluso la fórmula de **"entrada"** es más onerosa, pues se

---

[3] La Ley Electoral establece que se considerará "Partido Principal" todo aquél que obtuviera en el encasillado correspondiente a su insignia en la papeleta para Gobernador y Comisionado Residente, en la elección general precedente una cantidad no menor de siete (7) por ciento **(133,766)** del total de votos depositados para **todas las insignias de partidos,** o que obtuviera en la papeleta para Gobernador y Comisionado Residente en la elección precedente una cantidad no menor de tres (3) por ciento **(56,326)** del total de **papeletas íntegras** depositadas para todos los partidos; o cuyo candidato a Gobernador obtuviere en la elección general precedente una cantidad no menor de cinco (5) por ciento **(97,914)** del total de votos depositados para todos los candidatos a dicho cargo.

El valor numérico de los porcentajes exigidos por la ley, representan las cantidades necesarias para las elecciones del 2000.

computa a base de total de votos depositados para todos los candidatos al cargo de gobernador, mientras que la **"estadía"** se cualifica a base de papeletas íntegras, lo cual excluye las mixtas con votos para el cargo de gobernador.[4] Estas diferencias significativas nos mueven a concluir que para quedar inscrito como partido por petición, al utilizar la Asamblea Legislativa diferentes fórmulas –en virtud del "apoyo" ciudadano por excelencia, esto es, del voto depositado en las urnas–, se conceden a los partidos políticos principales unas ventajas que, aunque justificables, ostensiblemente les permiten perpetuarse.

El Estado aduce que el propósito del requisito de **exclusividad notarial** obedece a su interés de evitar candidaturas fraudulentas y frívolas, que las firmas en las peticiones sean confiables y que las agrupaciones políticas tengan apoyo del electorado. "El requisito de juramentación de las peticiones [ante notario] de los partidos por petición establece una garantía de veracidad de la intención del elector expresada en la petición y se protege la pureza en el procedimiento de inscripción de partidos. Esto permite, además, que pueda sancionarse cualquier acto ilegal por parte de la persona que toma el juramento". Informe Comisión de Gobierno de la Cámara sobre el P. de la C. 896.

No albergamos duda respecto de que tales intereses son legítimamente tutelables. P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 D.P.R. 248 (1980). Es regla conocida que en abono de una deferencia hacia el Poder Legislativo debemos esforzarnos por lograr interpretaciones congruentes y compatibles con el mantenimiento de la

---

[4]

| Elecciones Generales | Votos emitidos para Gobernador | Votos íntegros |
|---|---|---|
| 1996 | 1,958,296 | 1,877,542 |
| 1992 | 1,881,872 | 1,544,209 |
| 1988 | 1,792,153 | 1,599,476 |
| 1984 | 1,722,787 | 1,498,365 |
| 1980 | 1,609,311 | 1,432,416 |

constitucionalidad de una ley. En el caso de autos, existen medios menos onerosos para salvaguardar los intereses del Estado sin necesidad de declarar inconstitucional el requisito de **"exclusividad notarial"**. Veamos.

**Primero**, como disuasivo de fraude, el Art. 208 del Código Penal sanciona como delito la presentación de documentos falsificados para su archivo, registro o anotación en cualquier oficina pública de Puerto Rico, con pena de reclusión por término fijo de tres (3) años. En este extremo, además tenemos la técnica legislativa de exponer a las penalidades del perjurio a quien suscribe falsamente un documento. Art. 225, Código Penal. El contenido de múltiples documentos de importancia, tales como planillas de contribución sobre ingresos, del caudal relicto, declaración de patentes, pólizas ante el Fondo del Seguro del Estado, etc. son de este modo garantizados, **sin tener que ser suscritos ante notario solamente.**

**Segundo**, la Sec. 6.1 del propio Reglamento para la Inscripción de Partidos por Petición establece un proceso de convalidación de peticiones en la **Sección de Validaciones** de la Comisión Estatal. Allí, sus funcionarios pasan juicio sobre "la corrección, legalidad y validez" de cada petición y las revisan contra los récords y archivos de la Comisión. Entre los fundamentos para rechazar una petición de inscripción está que "la firma del peticionario [sea] incompatible con la que aparece en su petición de inscripción como elector". Sec. 4.7 (f). **Observamos pues, que para la Comisión Estatal, un endoso debidamente notarizado no goza totalmente de presunción de corrección y legitimidad.**

Ante estas realidades, ¿qué impide que las firmas de las peticiones de endosos sean **también** ante los funcionarios de las Juntas de Inscripciones Permanentes de cada municipio? Estas Juntas llevan a cabo un proceso **continuo** de inscripciones, transferencias y reubicaciones de electores, asuntos en que igualmente tiene que prevalecer la pureza electoral. Su capacidad y disponibilidad a tiempo

completo y la autenticación de la firma –avalada por certificaciones emitidas por sus funcionarios– logran los mismos propósitos legislativos. ¡Quiénes mejores que los funcionarios de las Juntas adscritos a la Comisión Estatal los que depuren el proceso contra posibles fraudes!

Este mecanismo **supletorio es adicional al uso de los notarios** y en términos históricos más afín con lo que ha sido la "tradición" respecto a las inscripciones de nuevos partidos. Alivia la onerosidad del reclutamiento de abogados notarios como **única** vía legal disponible en la autenticación de firmas.

Finalmente, –**una vez superada la característica de exclusividad notarial**– concluimos que el requisito de que las peticiones sean presentadas a la Comisión Estatal dentro de los siete (7) días de haber el notario tomado el juramento, es una medida razonable y justificada. Ello en virtud de dos vertientes, **primero**, la necesidad de evitar la acumulación de peticiones de inscripción cerca de la fecha límite para inscribir partidos. Y la **segunda**, notificar a la agrupación ciudadana interesada el número de inscripciones válidas realmente aprobadas, de forma que puedan subsanar oportunamente cualesquiera deficiencias antes de la fecha límite. No nos persuaden los argumentos del **P.A.C.** a los efectos de que duplicar –copiar– cada endoso y preparar informes de las peticiones a presentar sea tarea imposible de realizar en un término de siete (7) días.

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado