AC-1999-20                                                1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Partido Acción Civil<br>    Peticionario<br><br>   v.<br><br>Estado Libre Asociado de Puerto Rico,<br>et al<br>    Recurridos | Apelación<br><br>2000 TSPR 61<br>(RECONSIDERACION) |

Número del Caso: AC-1999-0020

Fecha: 25/04/2000

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Guillermo Arbona Lago

Abogado de la Parte Peticionaria:
                  Lcdo. Nelson Rosario Rodríguez
                  Lcdo. Roberto Ariel Fernández

Abogado de la C.E.E.:
                  Lcdo. Ramón L. Walker Merino

Oficina del Procurador General:
                  Hon. Gustavo A. Gelpí,
                  Procurador General
                  Lcda. Karen Pagán Pagán,
                  Procuradora General Auxiliar

Abogado del Comisionado del PNP:
                  Lcdo. José A. Carlo Rodríguez

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Acción Civil

    Peticionario

       Vs.                                    AC-1999-20
    Certiorari

Estado Libre Asociado de
Puerto Rico, et al

    Recurridos

PER CURIAM
(En Reconsideración)

San Juan, Puerto Rico, a 25 de abril de 2000.

Resolvemos la moción de reconsideración presentada por el Partido Acción Civil de nuestra Opinión Partido Acción Civil v. Estado Libre Asociado, et al, res. el 25 de febrero de 2000, 2000 T.S.P.R. 29, que sostuvo la constitucionalidad de los Arts. 3.001(3) y 3.002 de la Ley Electoral, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada. 16 L.P.R.A. ss. 3101(3) y 3102. Con el beneficio de la comparecencia de las partes a la vista oral, así como de los alegatos y documentos sometidos, se deniega la moción de reconsideración.

# I

El 25 de febrero de 2000, mediante Opinión del Tribunal, sostuvimos la constitucionalidad de los Arts. 3.001(3) y 3.002 de la Ley Electoral, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada. 16 L.P.R.A. ss. 3101(3) y 3102. Concluimos que dichas disposiciones, las cuales requieren que un abogado notario certifique las peticiones de endosos de las agrupaciones políticas que aspiran a convertirse en partidos por petición, y que las peticiones sean presentadas ante la Comisión Estatal de Elecciones dentro de siete días de su recolección, no violan la doctrina constitucional de acceso a la papeleta electoral. Indicamos, además, que las referidas disposiciones tampoco contravienen la cláusula de Igual Protección de las Leyes.

Oportunamente, el Partido Acción Civil presentó Moción de Reconsideración en la cual nos solicitó que declaráramos la inconstitucionalidad de las disposiciones impugnadas por considerar que era aplicable al caso de marras, como un mínimo constitucional, lo resuelto en Meyer v. Grant, 486 U.S. 414 (1988) y Buckley v. American Constitutional Law Foundation, 525 U.S. 182 (1999).

Además, presentó una solicitud de vista oral, a la cual accedimos. Simultáneamente concedimos a las partes un término para que compareciesen e ilustrasen a esta Curia, respecto a remedios alternos y la viabilidad de que otros funcionarios juramentaran endosos de inscripciones de partidos por petición.

En su comparecencia ante nos el Partido Acción Civil, argumentó que al amparo de Meyer, supra y Buckley, supra, el único mecanismo alterno constitucionalmente permisible es la utilización de voluntarios no abogados en la recolección y juramentación de los endosos de inscripción.

Por su parte, el Estado Libre Asociado y la Comisión Estatal de Elecciones señalaron que en atención al interés importante de atender la integridad del proceso electoral, sólo funcionarios que poseyeran un grado de veracidad en las certificaciones que juramentan que fuese análogo al de un abogado notario, podían ser considerados como posibles funcionarios alternos en la juramentación de los endosos de inscripción de los partidos por petición. Dichos funcionarios, de acuerdo al Procurador General y a la Comisión Estatal de Elecciones, lo son los jueces de la Rama Judicial y los Secretarios de los Tribunales.

Señalaron, además, en su comparecencia las consecuencias que la entrada de partidos políticos nuevos representa en cuanto al financiamiento y la forma de operación del aparato electoral puertorriqueño. De acuerdo a la Comisión, el costo de operación del sistema electoral es de aproximadamente cuarenta millones de dólares por cada partido durante el cuatrienio, y cada partido nuevo que se inscribe representa otro tanto. Dicha cantidad se desglosa en lo asignado por el Fondo Electoral, además de los gastos operacionales que implica cada nuevo partido: un Comisionado Electoral con sus ayudantes, un representante en cada una de las Juntas de Inscripción Permanentes, con su equipo y espacio de trabajo, ocho supervisores y el personal de balance.[1]

Respecto al historial electoral del Partido Acción Civil, la Comisión certificó que el Partido Acción Civil

---

[1] Durante la Vista Oral el Tribunal ordenó a la Comisión Estatal de Elecciones que sometiera documentos relevantes al presupuesto de la Comisión y sobre las agrupaciones que han solicitado quedar certificadas para comenzar el proceso de inscripción como partidos por petición desde el 1983 al presente.

De los documentos sometidos por la Comisión en cumplimiento de dicha orden surge que el costo anual de la representación de un partido político en las diferentes

quedó certificado el 20 de mayo de 1998, y que para la fecha de 25 de marzo de 2000, solamente había presentado treinta y cinco (35)endosos, de las cuales treinta (30) habían sido validados y cinco (5) habían sido rechazados.

La Comisión también certificó que el Partido Laboral Unidad Social, el cual fue certificado el 15 de marzo de 1998, es decir dos meses antes que el Partido Acción Civil, para la fecha de 29 de marzo de 2000, había presentado un total de 33,769 endosos, de los cuales 29,894 habían sido validados, 1,139 habían sido rechazados y 2,736 quedaban pendientes de validación.

## II

La vista argumentativa solicitada por el Partido Acción Civil se llevó a cabo el 31 de marzo de 2000. Las partes tuvieron oportunidad de hacer su exposición, así como de contestar las preguntas sometidas por esta Curia, y de refutar los argumentos presentados por la otra parte.

El propósito de la celebración de dicha vista fue dar la oportunidad al Partido Acción Civil de demostrar las diligencias llevadas a cabo en el proceso de inscripción del partido, para que a luz de los esfuerzos realizados, pudiésemos reexaminar si el requisito de la intervención notarial era uno severo u oneroso.

Examinada cuidadosamente la comparecencia del Partido Acción Civil, así como su contestación a nuestras preguntas y lo expresado en su turno de refutación, es forzoso concluir que no nos ha demostrado que llevó a cabo una diligencia razonable para lograr la inscripción del partido. Más aun, el récord demuestra  ausencia de un grado mínimo de esfuerzo, así como una tendencia a depender exclusivamente de la

---

estructuras de la Comisión es de $5,600,477.00 en cada año no electoral y de $13,800,477.00 en el año pre-electoral.

litigación, con el propósito de lograr la inscripción del partido. Veamos.

### (A) La recolección de endosos

Durante la vista celebrada el Tribunal indagó específicamente sobre las gestiones o esfuerzos hechos por el Partido Acción Civil para lograr su inscripción.

Uno de los argumentos principales del Partido Acción Civil fue que el sistema actual impide que el presidente del partido o sus familiares o amigos puedan recolectar endosos, en vista de que esto tienen que hacerlo los notarios. Indicó que había sometido seis (6) declaraciones juradas de abogados que sostienen que sería muy oneroso para ellos abandonar su práctica para autenticar los endosos requeridos. La Comisión Estatal de Elecciones señaló que el Partido Acción Civil no había provisto prueba a los efectos de que no había podido recolectar los endosos porque los notarios se habían negado a hacerlo.

Por su parte, la Comisión distinguió entre la recolección de endosos y la autenticación de las firmas de los endosantes. Los miembros o los voluntarios del partido pueden solicitar o recolectar los endosos, nada les impide hacerlo. Ahora bien, una vez el endosante accede a dar su endoso, tendrá que firmar el mismo en presencia de un notario público.

La Comisión señaló, y el Partido Acción Civil aceptó, que a la fecha de la vista el Partido solamente había sometido treinta (30) endosos válidos ante la Comisión. Dichos endosos fueron sometidos en septiembre de 1998. La representación legal del Partido Acción Civil aclaró que él era quien había recogido y notarizado los endosos durante un período de cuatro horas. El Partido Acción Civil aceptó que, a partir de esa fecha, no había hecho gestión alguna para

conseguir endosos, por haber enfocado sus esfuerzos en impugnar en los tribunales la validez de la Ley Electoral.

La Comisión Estatal señaló además de que a pesar de que este Tribunal le reconoció al Partido Acción Civil el derecho a obtener, mediante pago, copia de las listas electorales, _Partido Acción Civil_ v. _Comisión Estatal de Elecciones_, res. el de 27 de sep. de 1999, 99 T.S.P.R. 145, a la fecha de la vista no había solicitado las mismas de la Comisión[2]. El Partido Acción Civil respondió que no habían buscado las listas electorales en atención a su costo, y al hecho de que dicho asunto estaba íntimamente relacionado a la controversia en el caso de autos.

### (B) *La base electoral del Partido Acción Civil*

El Tribunal indagó sobre la base electoral del Partido Acción Civil, es decir el apoyo popular con que cuenta dicha agrupación política. El Partido Acción Civil señaló que en Puerto Rico existen cuatrocientos mil (400,000) votantes no inscritos quienes podrían constituir su apoyo o base electoral. También señaló que como su plataforma promueve la fórmula de la libre asociación, podrían contar con el apoyo de los cuatro mil (4,000) electores que votaron por esta alternativa en el plebiscito de 1999. Finalmente indicó que, una encuesta, llevada a cabo antes de la celebración del plebiscito de 1998, reveló que la fórmula de la libre asociación contaba con el apoyo de un quince por ciento (15%) de los encuestados.

---

[2] La representación legal del Partido Acción Civil argumentó que no habían recogido las listas electorales porque la Comisión les estaba cobrando mil ochocientos ($1,800.00) dólares por ellas. La representación legal de la Comisión respondió que esa es la cantidad que se cobra a todo aquél que solicita las listas, y que dicha cantidad es el costo de reproducción de las listas.

Por su parte, la Comisión Estatal de Elecciones señaló que el Partido Acción Civil además de haber sometido sólo treinta endosos, ni siquiera había presentado un listado de electores que lo apoyen, como evidencia de su pujanza electoral[3].

### (C) La diferencia en la regulación de candidatos a primarias o candidatos independientes y las agrupaciones políticas que interesan lograr la inscripción como partidos políticos

El Partido Acción Civil señaló que solicitaba se le permitiera utilizar notarios *ad hoc* para la certificación de los endosos. El Tribunal indagó cuáles eran las razones para permitir la utilización de notarios *ad hoc* en el caso de los candidatos a primarias y candidatos independientes, y no en el caso de los partidos por petición.

La Comisión señaló que existe una diferencia fundamental entre las consecuencias que acarrea cada proceso. La diferencia fundamental estriba en que las agrupaciones políticas que interesan ser certificadas como partidos políticos una vez someten los correspondientes endosos y éstos son validados, tienen unos derechos y prerrogativas que no tiene un candidato independiente o candidato a primarias. Sostuvo que merece enfatizarse el hecho de que una vez se logra la inscripción del partido, éste tiene derecho a fondos públicos. Por ejemplo, tiene derecho a participar del Fondo Electoral[4], tiene derecho a un Comisionado Electoral y a tener un representante en cada Junta de Inscripción

---

[3]   Debemos señalar que lo único que consta en autos que podamos interpretar como prueba del apoyo popular con el que consta el Partido Acción Civil son diez declaraciones juradas de personas que son miembros del Partido Acción Civil en las cuales declararon que están dispuestos a recoger endosos para inscribir el partido.

[4]   A pesar de que en varias ocasiones durante la vista la representación legal del Partido Acción Civil señaló la necesidad e importancia de participar del Fondo Electoral, al final de la vista señaló que estaba autorizado por su cliente para renunciar a su participación del Fondo Electoral.

Permanente, empleados cuyos sueldos se pagan con fondos públicos.[5] Señaló que esto es así porque en Puerto Rico, a diferencia de los estados americanos, se subvencionan los partidos políticos con fondos públicos. Por el contrario, el candidato a primarias o el candidato independiente no es acreedor de tales derechos.

La Comisión Estatal de Elecciones también señaló que la diferencia en trato se justifica porque el término que tienen los candidatos independientes y los candidatos a primarias para someter los endosos que requiere la ley es de dos meses. Por el contrario, las agrupaciones políticas que buscan la certificación como partidos políticos tienen un periodo de tres años y medio para someter los endosos correspondientes.

Por último, la Comisión indicó que el único cedazo que existe en el caso de los endosos de las agrupaciones políticas en proceso de inscripción como partidos, es la certificación por el notario. A diferencia de esto, respecto a los candidatos a primarias y los candidatos independientes, existen unos cedazos o filtros adicionales. Así por ejemplo, en el caso de los candidatos a primarias, el partido al cual pertenece ya es un partido inscrito, es decir ha demostrado un apoyo dentro del electorado. El candidato primarista pasa, en primer lugar por el proceso interno de su partido, en el cual tiene que demostrar que cuenta con un respaldo significativo a través de los votos de los electores de ese partido. De resultar victorioso en las primarias pasa por el cedazo final de las elecciones generales.

### (D) Remedio solicitado

---

[5] La Comisión reiteró en su exposición argumentativa lo expresado en su comparecencia sobre el costo al erario público que representa un nuevo partido.

El Partido Acción Civil rechazó expresamente el remedio de que jueces o secretarios de los tribunales autentiquen las firmas de los endosantes. También rechazó la alternativa propuesta en el Voto Disidente del Juez Asociado señor Negrón García en Partido Acción Civil v. E.L.A., Resolución emitida el 27 de octubre de 1999, 99 T.S.P.R. 163, de que empleados de las Juntas de Inscripción Permanente de la Comisión actúen como notarios *ad hoc*. El Partido Acción Civil solicitó que se le permita la certificación de endosos por los miembros del partido, sin necesidad de que intervengan en el proceso notarios o funcionarios públicos. Razonó que el estado cuenta con varios mecanismos para combatir el fraude, como lo son el procesamiento penal por los delitos de fraude o perjurio y la posible descertificación del candidato o partido que haya logrado su inscripción fraudulentamente.

### III

Examinados minuciosamente los autos, así como la comparecencia del Partido Acción Civil en la vista argumentativa del pasado 31 de marzo, nos es forzoso concluir que el Partido Acción Civil no ha demostrado tener un genuino interés en lograr la inscripción de dicha agrupación como partido por petición.

Son varios los hechos que nos mueven a esta conclusión: que en el tiempo transcurrido desde su certificación hasta el presente haya solamente presentado ante la Comisión treinta (30) endosos válidos, los cuales, según su propia admisión, fueron certificados por un solo notario durante el transcurso de cuatro horas; que tras litigar hasta este Foro el asunto de las copias de las listas electorales, con el consabido esfuerzo y costo que esto conlleva tanto para las partes como para el sistema judicial, no hayan recogido dichas copias; la ausencia de un listado de electores dispuestos a endosar

el partido; la "renuncia" a última hora y como último recurso a la participación en el Fondo Electoral; su negativa a considerar mecanismos alternos para la certificación de endosos por los notarios, que por tratarse de funcionarios públicos cuenten con un grado de confiabilidad mayor que los miembros del propio partido. Todo esto nos lleva a determinar que el Partido Acción Civil no ha demostrado una diligencia razonable en la defensa del interés concreto que pretende litigar.

Las peticiones de endosos presentadas por el Partido Acción Civil ante la Comisión representan un .003% de los 97,784 endosos requeridos para su inscripción. Usando los números suministrados por la representación legal del Partido Acción Civil, a los fines de que en cuatro horas recolectó y notarizó treinta (30) endosos válidos, un simple cálculo matemático nos demuestra que nueve (9) notarios certificando endosos durante ocho (8) horas a la semana, hubiesen notarizado 98,280 endosos durante un período de tres años y medio, término dispuesto por la Ley Electoral para la inscripción de los partidos por petición.

También cabe señalarse que en Puerto Rico existen ciento cuatro (104) precintos electorales. Bastaría con utilizar dos notarios por precinto y que cada uno certificase quinientos endosos para recolectar 104,000 endosos, lo cual excede el número de endosos requeridos. Para dicha tarea contarían, por supuesto, con los tres años y medio dispuestos en la Ley Electoral.

Además, de la prueba presentada en la vista debemos concluir que la base electoral con la cual alega contar el Partido Acción Civil es una abstracta e hipotética. A excepción de diez declaraciones juradas que constan en el expediente, en las cuales diez miembros del partido expresan

que están dispuestos a recoger endosos, el Partido Acción Civil no nos ha demostrado que cuenta con el apoyo de personas o grupos identificables, lo cual necesita toda agrupación política que aspira a convertirse en un partido político y a presentar candidatos en todo el país.

## IV

Nos corresponde finalmente analizar el argumento del Partido Acción Civil de que en el caso de autos son de aplicación los casos federales de Meyer, supra y Buckley, supra. Concluimos que dicha jurisprudencia no apoya la tesis del Partido Acción Civil, y es claramente distinguible de la situación ante nos. Debemos señalar que, a diferencia del caso de autos, en Meyer, supra y Buckley, supra, los peticionarios presentaron ante los tribunales de instancia una extensa prueba, con el propósito de demostrar los esfuerzos realizados, y cómo los requisitos impugnados eran extremadamente onerosos.

La jurisprudencia citada no versa sobre la regulación de asociaciones políticas en su esfuerzo de lograr acceso a la papeleta electoral, sino de la regulación de propuestas de iniciativa ciudadana, según permitido en el estado de Colorado[6]. En ambos casos, el Tribunal Supremo federal invalidó ciertos requisitos exigidos a los recolectores de endosos para iniciativas de legislación popular, por considerar que violaban el derecho de libertad de expresión

---

[6] En Meyer, supra, el Tribunal Supremo federal invalidó una disposición que prohibía que los recolectores de endosos para impulsar iniciativas de legislación popular recibiesen una compensación económica. En Buckley, supra, se invalidó el requisito de que los recolectores de endosos para impulsar iniciativas de legislación popular tuviesen que ser electores inscritos; que se les requiriese usar en su vestimenta una identificación con su nombre; y que obligaba a los propulsores de la legislación popular a informar el nombre y la dirección de los recolectores de endosos y la cantidad de dinero que se le había pagado por su trabajo.

garantizado por la Primera Enmienda de la Constitución federal.

Tanto en Meyer, supra, como en Buckley, supra, el Tribunal concluyó que las restricciones impuestas restringían de modo significativo la comunicación con los posibles electores, ya que infringían impermisiblemente la comunicación política directa ( "one on one communication"), limitaban el número de personas que podían llevar el mensaje político envuelto, y en consecuencia limitaban la audiencia a la cual podía llegarle el mensaje.

En el caso ante nos las disposiciones impugnadas no restringen la libertad de expresión de los miembros del Partido Acción Civil. Nada hay en ellas que imponga unas restricciones en cuanto a las personas que pueden llevar el mensaje político esbozado por dicho partido para convencer a ciudadanos inscritos a endosar las peticiones de inscripción, ni quienes pueden actuar como recolectores de endosos. Los miembros del partido están en plena libertad de hacer aquellas expresiones que crean necesarias, así como de difundir su mensaje político en los medios que consideren convenientes. De igual manera, nada les impide que se comuniquen directamente con los posibles electores, es decir que se acerquen a los posibles electores para comunicarles su plataforma política, solicitar su apoyo y pedir que llenen las peticiones de endosos. Todas estas funciones, las cuales son parte integral y central de la expresión política, están disponibles a todos los miembros del partido; las mismas no están restringidas a los abogados notarios.

Por disposición estatutaria, la función del notario está limitada a la juramentación de las peticiones de inscripción. Es decir, la intervención del notario se limita a la forma en que debe de llevarse a cabo el endoso. Los miembros del

Partido Acción Civil, pueden ejercer a cabalidad su derecho de expresión política, contrario a lo ocurrido en Buckley, supra. No están impedidos de acercarse a los ciudadanos para transmitir su mensaje político e intentar conseguir su apoyo para lograr la inscripción del partido. De hecho, no existe ningún requisito que limite la capacidad de los miembros del partido a llenar y recolectar los endosos requeridos, con toda la información pertinente, menos la firma de la persona. Una vez un ciudadano manifieste su deseo de ayudar en la inscripción, le corresponde a los recolectores del Partido Acción Civil, a tenor con el requisito de la Ley Electoral, hacer las gestiones para que el endoso sea notarizado[7].

En el caso de Buckley, supra, las Opiniones Concurrentes del Juez Thomas y de la Juez O'Connor, a la cual se unió el Juez Breyer, reconocen que existe una diferencia entre las disposiciones que tienen el efecto de reglamentar directamente el aspecto comunicativo de las peticiones, y aquellas que meramente regulan los mecanismos del proceso electoral. Id. a las págs. 208 y 214.

> Some regulations govern the electoral process by directing the manner in which an initiative proposal qualifies for placement on the ballot. These latter regulations may indirectly burden speech but are a step removed from the communicative aspect of petitioning and are necessary to mantain an orderly electoral process. Accordingly these regulations should be subjected to a lesser standard of review. Id. a la pág. 214. (O'Connor, Op. Concurrente).

Más aun, la Opinión del Tribunal en Buckley, supra, reconoció que es necesario que exista una reglamentación

---

[7] Para ello pueden valerse de diversos métodos: pueden enviar o llevar a los electores a las oficinas de los notarios; pueden tener un notario que los acompañe en sus campañas de recolección de endosos; pueden localizarse en lugares estratégicos y de acceso público con personal que lleve el mensaje político y solicite los endosos y simultáneamente tener notarios que juramenten los endosos, etc.

sustancial del proceso eleccionario, si es que éste ha de ser justo y honesto, y que los estados tienen amplia discreción para proteger la integridad del proceso electoral. <u>Id</u>. a las págs. 185 y 191. Expresamente señaló, citando jurisprudencia anterior, que el riesgo de fraude y corrupción que existe en la elección de candidatos, no está presente en las votaciones de propuestas de legislación popular. <u>Id</u>. a la pág. 203.

**V**

En atención a lo anteriormente expuesto, confirmamos nuestra determinación anterior de que las disposiciones de la Ley Electoral impugnadas no adolecen de vicio constitucional.

Más aun, de los documentos presentados por la Comisión Estatal de Elecciones en cumplimiento de la Orden dada en la Vista Oral por este Tribunal, surge que las disposiciones impugnadas no son tan onerosas como para imposibilitar que una agrupación política **que demuestre un grado de diligencia razonable** logre acceso a la papeleta electoral.

Según el Informe de Relación de Partidos por Petición radicado ante este Foro el pasado 5 de abril, surge que de 1983 al presente, diez asociaciones políticas solicitaron quedar certificadas ante la Comisión para comenzar el proceso de inscripción como partidos por petición. De estas diez, tres lograron su inscripción y participaron en el proceso electoral: el Partido Renovación Puertorriqueña a nivel isla en las elecciones de 1984, el Movimiento Local Viequense como partido local en las elecciones de 1992, y el Partido Frente Unido Riograndeño como partido local en las elecciones de 1996.

De las siete asociaciones políticas restantes, una, el Partido Democrático Participativo Representativo, no ha podido obtener la certificación de nombre y emblema, por estar este asunto pendiente de litigación en los tribunales.

De las otras seis agrupaciones políticas, al presente hay dos pendientes de inscripción: el Partido Laboral Unidad Socialista el cual ha radicado 34,561 endosos, y el Partido Acción Civil el cual ha presentado 35 endosos.

Las restantes cuatro asociaciones políticas no lograron su inscripción para participar en las elecciones de 1996. De estas cuatro, cabe señalarse que tres no radicaron petición alguna: el Partido Alternativa, el cual fue autorizado para recoger endosos en diciembre de 1993, el Partido Unión Nacional y el Partido Puertorriqueños por P.R., los cuales fueron autorizados para recoger endosos en febrero de 1996. La otra agrupación restante, el Partido Reformista de P.R., el cual fue autorizado para recoger endosos en octubre de 1993, presentó 1,248 peticiones de las 94,094 requeridas, es decir un 1.32% de los endosos requeridos, a pesar de haber tenido más de dos años y medio para demostrar que contaba con un apoyo del electorado.

Debemos también, tomar en consideración, el hecho de que el Estado subvenciona los partidos políticos a través del Fondo Electoral, y el costo que supone la participación de cada partido en el esquema operacional de la Comisión Estatal de Elecciones. En nuestra jurisdicción, una vez las agrupaciones políticas logran inscribirse como partidos por petición, tienen derecho a participar en el Fondo Electoral. Dicha cantidad está fijada por ley, independientemente de la suma que el partido haya podido recolectar por su cuenta. Es decir, una vez satisfecho el número de endosos requeridos, los partidos participan en igualdad de condiciones.

Aunque existen diversos mecanismos de financiamiento público de campaña, en el caso nuestro, el sistema provee fondos en bloque a los partidos inscritos. Con el propósito de garantizar que esta subvención se utilice únicamente por

las agrupaciones políticas que tienen un poder real de convocatoria entre nuestro electorado, la Ley Electoral contiene unos requisitos mínimos de elegibilidad. En ese sentido se ha expresado:

> Any program that gives away taxpayer money must include some standards to determine who qualifies for the money. Because one of the goals of almost all public subsidy programs is to make it easier for more candidates to run for office, the qualifying provisions cannot be onerous. **If it is too easy to qualify, however, the program runs the risk of losing credibility when, for instance, a marginal candidate makes a career of losing elections at public expense or simply too many candidates flood the system. Eligibility requirements may be less crucial in matching fund and rebate or credit programs than they are in block grant programs because the candidate's subsidy is subjected to a kind of ongoing market test – the candidates will benefit from public money only if they are able to raise money on their own.** Daniel, Elizabeth, "Subsidizing Political Campaigns: The Varieties and Values of Public Financing", Brennan Center for Justice, http://www.brennancenter.org/resources/ resources_cfrseries.html. (énfasis nuestro).

Además, una vez un partido se inscribe tiene derecho a nombrar un Comisionado Electoral y un Comisionado Alterno, y a participar con voz y voto en las deliberaciones de la Comisión Estatal de Elecciones. También tiene derecho a tener un Comisionado Local en cada precinto electoral y a tener el personal de apoyo que de ordinario forma parte de la representación de los partidos en las diferentes dependencias de la Comisión Estatal de Elecciones. Ley Electoral, según enmendada, Art. 1.004 *et seq.,* 16 L.P.R.A. sec. 3004 *et seq.* En fin, la inscripción de un partido lo convierte en parte del organismo gubernamental que dirige el proceso electoral y adquiere por ende unas funciones cuasi públicas de gran importancia en nuestro sistema democrático. P.R.P. v E.L.A., 115 D.P.R. 631 (1984); Fuster v Busó, 102 D.P.R. 327 (1974). El requisito impugnado en el caso de autos provee un mecanismo para que el Estado se asegure que las agrupaciones

que formen parte de este cuerpo directivo demuestren fehacientemente que realmente constituyen un partido que representa un sector importante del electorado con derecho a participar en las deliberaciones de ese organismo gubernamental.

Por último debemos señalar que el requisito de la certificación notarial de los endosos, tomando en cuenta el historial de fraude político en nuestra jurisdicción, lo que persigue precisamente es ofrecer una garantía de confiabilidad que haga innecesario tener que llegar a las medidas drásticas propuestas por el Partido Acción Civil para salvaguardar la pureza del proceso electoral, como lo son la descertificación de un candidato o de un partido, aun después de celebradas las elecciones.

Si consideramos que de la vista oral celebrada surge que de 1998 al presente, el peticionario solamente ha dedicado cuatro horas al esfuerzo de recoger endosos, es altamente cuestionable y preocupante que mediante el remedio solicitado pretenda que declaremos inconstitucional algunas de las secciones de nuestro esquema electoral que tienen precisamente el propósito de evitar la inscripción indebida de partidos que no tienen apoyo popular.

Por las razones expuestas anteriormente se deniega la Moción de Reconsideración.

Se dictará la Sentencia correspondiente.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Acción Civil

   Peticionario

      v.                              AC-1999-20
Certiorari

Estado Libre Asociado
de Puerto Rico, et al

   Recurridos

SENTENCIA

San Juan, Puerto Rico, a 25 de abril de 2000.

Por los fundamentos expuestos en la Opinión que antecede, los cuales se hacen formar parte integral de la presente, se declara sin lugar la moción de reconsideración presentada.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió Opinión Disidente. La Juez Asociada señora Naveira de Rodón disiente sin opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido de Acción Civil

　　　Peticionario

　　　　　　v.

　　　　　　　　　　　　　AC-1999-20

Estado Libre Asociado de

Puerto Rico, et al.

　　　Recurridos

Opinión Disidente del Juez Asociado señor Negrón García

(En reconsideración)

San Juan, Puerto Rico, a 25 de abril de 2000

Por su valor de precedente y carácter repetitivo, este recurso va más allá y trasciende los derechos constitucionales de los electores que integran el Partido de Acción Civil (PAC).

El gravoso requisito legislativo que obliga individualmente a los electores a acudir y jurar exclusivamente ante abogados-notarios sus endosos inscripcionarios, ha subordinado la creación de cualquier partido político a esa clase profesional.

Se trata de un privilegio elitista e irritante. De su faz y operacionalmente es irrazonable e inconstitucional, pues concede de manera absoluta a

esta clase profesional, en su etapa inicial crítica, la exclusiva prerrogativa de darle eficacia y virtualidad jurídica a los derechos de expresión, asociación y sufragio de los electores. <u>La voluntad electoral se convierte en voluntad notarial.</u>

El resultado es que, inconcebiblemente, en el Puerto Rico de hoy y el de mañana, el reconocimiento de la paternidad filiatoria en el nacimiento y registro de un partido político nuevo, en última instancia <u>es notarial, no electoral</u>.

Entregar y dejar sólo en manos de los abogados-notarios tan valioso derecho no se justifica como única medida contra el fraude, existiendo otras menos onerosas. Máxime, en aras de una tradición legislativa imaginaria e inexistente que, en la práctica, sólo beneficia la hegemonía y perpetuidad de los partidos políticos principales que han dominado el escenario comicial e ideológico puertorriqueño por más de medio siglo.

El Estado no puede aprisionar en el privilegio de una clase profesional estos derechos constitucionales, ni asfixiar en una cápsula de tiempo las aspiraciones electorales ciudadanas (pocas o muchas en sus inicios, con o sin recursos económicos), de lograr una franquicia electoral.

I

El Art. 3.001 (3) de la Ley Electoral actual –Núm. 4 de 15 de noviembre de 1978– exige que el endoso de un elector promoviendo un nuevo partido político sea únicamente por petición jurada ante abogados-notarios.[8] **Su texto no obliga, expresa ni implícitamente, a ningún abogado-notario a realizar**

---

[8] Establece:

"Se considerará como 'Partido por Petición' a cualquier agrupación de ciudadanos que, con el propósito de figurar en la papeleta electoral de unas elecciones generales, **en o antes del primero de junio del año de elecciones** se inscriba como partido político, mediante la radicación ante la Comisión de peticiones juradas al efecto, **ante notarios públicos admitidos al ejercicio de la notaría**,..., quienes percibirán de la Comisión Electoral un (1) dólar por cada petición notarizada válida como honorarios, suscritas por un número de electores no menor del cinco (5%) por ciento del total de votos depositados para todos los candidatos al cargo de Gobernador en la elección precedente...." (Énfasis nuestro).

**ministerialmente esa función.** De optar discrecionalmente hacerlo, en o fuera de su oficina, mediante la retribución de un dólar, deberá posteriormente preparar y rendir cuatro informes: el primero a la Comisión Estatal de Elecciones, y otro quincenal, nuevamente a dicho organismo. Además tendrá que transcribir a manuscrito cada endoso en su <u>Libro de Afidávit</u>, e incluirlos en el índice notarial mensual, que deberá rendir a la Oficina de Inspector de Protocolos. **La Ley Electoral tampoco provee funcionarios, mecanismos o fórmulas alternas que viabilicen esos endosos de manera distinta. <u>Antes no existía este monopolio electoral absoluto de la clase profesional de abogados-notarios; ahora, sencillamente nadie más puede hacerlo, no hay otras opciones.</u>**

Discriminatoria e irrazonablemente el requisito se impone sólo a los electores que desean fundar nuevos partidos a nivel isla o local. **No se exige para candidatos independientes, primarias internas, primarias presidenciales, ni plebiscitos.** Según el <u>Informe de la Comisión de Gobierno de la Cámara</u> el requisito "establece una garantía de veracidad de la intención del elector expresada en la petición y se protege la pureza en el procedimiento de inscripción de partidos." Argumenta el Estado y la Comisión Estatal de Elecciones que esa salvaguarda promueve el interés apremiante de evitar el fraude y constatar que haya una muestra auténtica de apoyo o base electoral.

**Evitar el fraude, reconocemos, es interés apremiante presente y aplicable <u>a todo trámite y etapa de cualquier evento electora</u>l, sean elecciones (generales o especiales), primarias, plebiscitos, referéndums, etc.** Los partidos políticos son vehículos de expresión, mediante los cuales los ciudadanos manifiestan su respaldo u oposición a los

diversos programas de gobierno, y al mismo tiempo, afianzan la democracia proponiendo candidatos a cargos públicos. La constante participación activa y fiscalización recíproca de sus miembros insertos en la estructura administrativa electoral, en calidad de funcionarios representativos, imparte confiabilidad, pureza y viabiliza la celebración ordenada y justa de los eventos comiciales. Al adquirir sus franquicias obtienen condición de organismos cuasi-públicos dentro del entramado constitucional y en el funcionamiento del gobierno. Tan importantes funciones requieren un cedazo serio que impida que un grupo, mediante el fraude, llegue a tener esas valiosas prerrogativas y  responsabilidades.

Pero en casos como el de autos, el Estado ha ido más allá de lo necesario en su celo y protección contra el fraude. En su discurso forense –con el aval de una mayoría del Tribunal–, ha invertido los valores y elevado a categoría de interés apremiante principal el impacto presupuestario que representa todo nuevo partido político. Acepta que a los candidatos independientes no se les requiere que sus peticiones de endoso estén juramentadas cada una ante abogados-notarios.[9] Según indicado, tampoco se impone a los trámites de inscripción de los demás eventos de igual naturaleza electoral. Sin embargo,

---

[9] Dispone en parte el Art. 4.027 de la Ley Electoral:

"Se considerará candidato independiente aquella persona que radique ante la Comisión Estatal de Elecciones peticiones de nominación que ésta aceptare, en cantidad no menor del cinco por ciento (5%) del total de votos obtenidos en la última elección general por todos los candidatos al puesto electivo que dicha persona aspire.

Los candidatos independientes a cargos de Senador o Representante por acumulación presentarán peticiones de nominación en una cantidad igual al cinco por ciento (5%) del total de votos emitidos para Gobernador en las elecciones generales precedentes, dividido entre once (11). Tales peticiones sólo podrán ser suscritas por electores

con referencia a los candidatos independientes apoya esta diferencia en que éstos no participan del Fondo Electoral, ni forman parte de la administración en las elecciones. Expone en términos de millones de dólares su argumento principal. (Per Curiam, págs. 3-4).

**Se olvida así que el antídoto medicinal legislativo contra el fraude está constitucionalmente contraindicado y no puede aplicarse si, como "reacción adversa", se convierte en veneno mortal contra la salud democrática del cuerpo electoral ciudadano, simplemente porque hay fondos públicos envueltos.**

**El fraude electoral es malum in se, pues devalúa la integridad del voto, levadura que hace crecer o disminuir nuestra democracia. Evitarlo es un interés apremiante incuestionable con o sin Fondo Electoral**. No obstante, rechazamos que la constitucionalidad del requisito único de fe pública notarial en los endosos pueda sostenerse a base del Fondo Electoral y las otras consecuencias financieras y administrativas que recaen sobre el aparato electoral. En la constelación de los valores constitucionales envueltos – libre expresión, asociación, y sufragio–, el impacto presupuestario, aunque importante, es un factor de segundo orden a la obtención de la franquicia electoral. **Por su carácter posterior, no puede servir de excusa oficial apriorística para imponer trabas iniciales, onerosas y distintas al advenimiento de nuevos partidos políticos.** El argumento, equivocadamente, eleva a principio rector lo económico y relega a uno inferior el derecho a participar en

_____

que tengan derecho a votar por el cargo a que se aspire." 16 L.P.R.A. 3177.

los procesos electorales, consustancial con los derechos
constitucionales fundamentales mencionados.[10]

## II

La postura legislativa de exigir el requisito de endoso
ante abogados-notarios sólo para partidos por petición,
obstaculiza y contrasta elocuentemente con el resto del
esquema electoral vigente y la legislación especial de época
reciente en que el Estado ha interesado promover determinados
eventos electorales: los plebiscitos.

**En torno a esos eventos, la Asamblea Legislativa nunca ha
requerido a los electores compulsoriamente acudir ante
notarios. La historia contemporánea refleja una legislación
laxa y sumamente liberal en cuanto a endosos se refiere, aun
cuando las nuevas agrupaciones han recibido asignaciones
especiales de naturaleza analógica al Fondo Electoral.[11]
Igualmente han generado desembolsos en la estructura
administrativa de la Comisión Estatal.** Nos referimos a las
Leyes Núms. 1 de 23 de diciembre de 1966, Núm. 22 de 4 de
julio de 1993  y Núm. 249 de 17 de agosto  de  1998 –

---

[10] La mayoría (Per Curiam, pág. 9, escolio 4), singulariza la renuncia "verbal y prematura" al Fondo Electoral comunicada por el abogado del PAC en la vista oral. Decimos prematuramente, pues como indicó el Juez Presidente señor Andréu García, el PAC no puede renunciar a lo que no tiene derecho.

[11] Para el Plebiscito de 1966 se puso a la disposición de **cada grupo que aceptó la representación de una fórmula de status** la cantidad de $385,000.00, de los cuales $250,000.00 serían utilizados para gastos generales de campaña y propaganda; $60,000.00 para transportación de electores y los restantes $75,000.00 para gastos administrativos. Ley Núm. 1 de 23 de diciembre de 1966, Art. 92.

En 1993 se asignaron $2,700,000.00 para los gastos de los partidos políticos y **cualquier agrupación, organización o entidad certificada** para representar una de las fórmulas, los cuales se dividirían en partes iguales. Ley Núm. 22 de  4 de julio de 1993, Art. 28.

Por último, la Ley del Plebiscito de 1998 otorgó $2,000,000.00 a distribuirse equitativamente entre los partidos políticos o **agrupaciones certificadas** para

plebiscitos sobre nuestro status político-, en lo concerniente a aquellas fórmulas que no estuvieran representadas  por los partidos políticos inscritos. **Para esas circunstancias, la Asamblea Legislativa fomentó y auspició la creación de agrupaciones electorales ciudadanas**. Uno de los requisitos a cumplimentar fue **la simple presentación de endosos <u>sin estar jurados individualmente ante notarios</u>**. El plebiscito correspondiente al 1966 sólo requirió una **lista con firmas** equivalentes al uno por ciento (1%) de los electores que votaron en las pasadas elecciones por el partido político que promovió la fórmula de status a ser representada por la agrupación. Esta lista tenía que estar acompañada de **una sola declaración jurada** del Presidente u otro de los directivos de la agrupación concernida a los efectos de que las firmas de los electores eran auténticas, brindadas para conseguir la representación organizacional deseada y que poseían las direcciones de cada endosante.

---

representar una de las columnas. Art. 29, Ley 249 de 17 de agosto de 1998.

Para el plebiscito de 1993, el texto de ley únicamente precisó una lista de los electores endosantes. En el plebiscito de 1998 se exigieron peticiones de endoso suscritas, equivalentes a no menos del tres por ciento (3%) de los electores que votaron en el plebiscito de 1993 por la opción de status que menos votos obtuvo para dicha consulta. **Como forma de juramentarlas se incorporó la norma liberal que rige para primarias de notarios <u>ad hoc</u>** –electores autorizados por la Comisión Estatal–, **método que aún subsiste** en el Art. 4.011 de la Ley Electoral:

> "La petición de primarias se podrá juramentar, además de ante los funcionarios autorizados por ley para tomar juramentos, **ante cualquier elector autorizado por la Comisión para llevar a cabo esa función a petición de cada candidato en primarias**.

> Las personas autorizadas a tomar juramentos relacionados con peticiones de primarias **serán consideradas funcionarios de la Comisión para todos los efectos legales**, y deberán llevar un récord de todas las personas y de la fecha en que se ha tomado el juramento. Este récord será firmado y remitido a la Comisión al finalizar el período durante el cual se pueden radicar peticiones de primarias." (Énfasis suplido).

Se observa pues, que cuando el interés de la Asamblea Legislativa es promover, viabilizar, y otorgar franquicias representativas electorales temporales (no permanentes) –y avalar primarias partidistas–, utiliza dos (2) varas distintas y contradictorias, **aun cuando en todas el interés apremiante de evitar el fraude es idéntico y de igual intensidad.** Lo mismo podemos decir de los efectos fiscales. En esas circunstancias cesó de ser importante ese interés aun cuando existió un Fondo Electoral especial, y las                 nuevas agrupaciones tuvieron impactos presupuestarios significativos. **La única diferencia sustancial detectable es que se trató de eventos que beneficiaban los intereses partidistas de los tres partidos políticos tradicionales.**

**Es inescapable concluir que en su tratamiento electoral la Asamblea Legislativa se proyecta circunstancialmente polifacética: una cara, liberal y generosa, siempre y cuando convenga políticamente; la otra cara, seria y conservadora, si implica abrir las puertas para la formación de partidos políticos nuevos permanentes.**

En abono de este tratamiento diferencial, la Comisión Estatal aduce que la laxitud de endosos sin abogados-notarios se justifica pues los plebiscitos fueron eventos electorales pautados legislativamente para unas fechas cercanas en que había poco tiempo disponible para exigirlos. Igual argumento expone respecto las primarias. Ello, a su juicio, contrasta con la génesis de nuevos partidos, para los cuales los electores tienen potencialmente tres y medio años contados desde la última elección general celebrada.

Las diferencias son más aparentes que reales. El Reglamento para los Procesos de Radicación de Candidaturas y Primarias de los Partidos Políticos[12] requiere que un candidato a primarias recoja cinco mil firmas en un espacio de dos meses –desde la apertura del periodo de radicación de candidaturas el 1º de julio del año anterior al que se celebrarán las elecciones generales (Reglamento, sec. 3.5), hasta el 1º de septiembre del mismo año (Reglamento, sec. 3.6(b)). **No impone, sin embargo, el requisito de que cada una esté notarizada individualmente bajo la premisa de que esta exigencia sería muy onerosa en un espacio tan corto de tiempo.**

En su dimensión matemática-temporal, es de notar **que no hay diferencia significativa entre la inscripción de un candidato a primarias y la de un partido por petición.** Cinco mil (5,000) firmas en dos meses equivalen treinta mil (30,000) en un año, y éstas, proyectadas a un espacio de tres años y

medio –término máximo que tiene un partido por petición para inscribirse– llegan a ciento cinco mil (105,000), cifra comparable con la requerida a los partidos por petición.

**Forzoso concluir que si es oneroso el requisito de notarización individual de firmas para los candidatos a primarias –que llevan la ventaja de desenvolverse dentro de una estructura organizacional y agrupación previamente establecida–, también, con mayor razón, lo es para los partidos por petición.**

No obstante, la mayoría al suscribir el argumento de la Comisión Estatal, expone sus propias y peculiares fórmulas de distribución de notarios que pudo y debió usar el PAC para inscribirse dentro de "los tres y medio años dispuestos en la Ley Electoral". A tal efecto, nos dice:

> "Usando los números suministrados por la representación legal del Partido Acción Civil, a los fines de que en cuatro horas recolectó y notarizó treinta (30) endosos válidos, un simple cálculo matemático demuestra que nueve (9) notarios certificando endosos durante ocho (8) horas a la semana, hubiesen notarizado 98,280 endosos **durante un período de tres años y medio, término dispuesto por la Ley Electoral para la inscripción de los partidos por petición.**
>
> También cabe señalarse que en Puerto Rico existen ciento cuatro (104) precintos electorales. Bastaría con utilizar dos notarios por precinto y que cada uno certificase quinientos endosos para recolectar 104,000 endosos, lo cual excede el número de endosos requeridos. **Para dicha tarea contarían, por supuesto, con los tres años y medio dispuestos en la Ley Electoral.**" (Opinión Per Curiam, pág. 12).

**El argumento es peligrosamente antidemocrático. "Es de la esencia de la libertad ciudadana el cambiar su    opinión y manifestarse de acuerdo. El proceso electoral fundamentalmente es una expresión de juicio de los electores y éste tiene que ser mudable como lo son las circunstancias de la vida de un**

---

[12] Comisión Estatal de Elecciones, 26 de mayo de 1999.

**país**." <u>Rivera Lacourt</u> v. <u>Junta Estatal de Elecciones</u>, 100 D.P.R. 1023, 1029 (1971).[13]

Las fórmulas matemáticas concebidas por la mayoría descansan en un escenario estático e irreal. Ambas tienen como punto común de partida, el ideal de que la notarización de 97,874 endosos **se inicie** en los "tres y medio años dispuesto en la Ley Electoral." Podríamos especular otras fórmulas que en distintos momentos, y en estricta matemática, reflejarían esa posibilidad; como

---

[13] Cita tomada del Alegato del Procurador General, avalada en esa decisión.

razón de decidir, nos abstenemos. **Ese enfoque judicial temporaliza y congela mecánicamente los derechos constitucionales de expresión, asociación y sufragio a los inicios de un itinerario cuatrenial.** Ignora la naturaleza cambiante de los seres humanos, y los sucesos cotidianos sociales que nutren la vitalidad dinámica de una verdadera democracia. **Movimientos y núcleos ciudadanos como los del PAC, de ordinario no son instantáneos, sino productos de fenómenos y reacciones sociales paulatinas de la diaria y variante realidad puertorriqueña ante la buena o mala obra gubernamental.** Pueden surgir inmediatamente, a raíz de unas elecciones o en cualesquiera de sus años posteriores. De hecho, la única restricción de característica temporal sobre el derecho de un elector a cambiar de opinión y endosar la inscripción de partidos nuevos, -cuya validez constitucional no está aquí en juicio-, la encontramos en el Art. 3.002(b) de la Ley Electoral preceptivo de que el elector no puede haber "firmado durante el período de dos (2) años inmediatamente precedente una petición para inscribir [a] otro partido."

En términos de temporalidad cuatrenial, por razón de la proximidad de las elecciones generales -calendarizadas en el Art. VI Sec. 4 de nuestra Constitución para "el día del mes de noviembre que determine la Asamblea Legislativa"-, sólo cabe legislativamente argüir e interponer una fecha límite válida para tales inscripciones: actualmente, el 31 de mayo del año correspondiente a la elección general. **Pero ello no niega la realidad de que el PAC y otras agrupaciones legítimamente pueden surgir y formarse lenta o rápidamente, en cualquier año de un cuatrienio, sin que pueda oponerse al ejercicio ciudadano dinámico, libre y democrático la norma de exclusividad notarial con el argumento mayoritario de que no fueron diligentes y, en vez de litigar y depender de este**

**recurso (<u>Per Curiam</u>, pág. 5), debieron, para poder lograrlo, comenzar antes la inscripción y notarización de los 97,874 endosos.**

### III

Por otro lado, la opinión mayoritaria concluye que el PAC "no ha demostrado tener genuino interés en lograr la inscripción" como partido por petición. (<u>Per Curiam</u>, pág. 5). Basa esta conclusión en varias "determinaciones de hechos" que expondremos y evaluaremos simultáneamente. Lo hacemos conscientes de que este foro –distinto a cuando ejerce su jurisdicción original–, está simplemente ejercitando su clásica facultad revisora apelativa, no actuando como Tribunal de Primera Instancia. Ciertamente, hemos de evitar caer en la tentación de que las vistas orales –con nuestras preguntas y las respuestas de los abogados de las partes–, se conviertan realmente en unas evidenciarias, para lo cual carecemos de facultad. Con esta nota cautelar, examinemos las conclusiones fácticas de la mayoría, a la luz de los autos originales y la vista oral.

**Primero**, la mayoría destaca que el PAC ha recogido sólo treinta (30) endosos válidos certificados por un notario en cuatro (4) horas. (<u>Per Curiam</u>, págs. 6-7). Distinto a la percepción mayoritaria, ello no es demostrativo de falta de diligencia, sino de lo oneroso del requisito para los electores y abogados-notarios. **En la vista oral se acreditó la existencia de una razón poderosa para esta limitada gestión. El notario en cuestión –Lcdo. Nelson Rosario Rodríguez, representante legal del PAC–, aclaró con absoluta honradez y candidez, que el descargo cotidiano de sus otros compromisos profesionales de abogado, como medio de vida para cumplir financieramente los deberes paterno-filiales y de manutención, le impidieron dedicar más tiempo del que ya había consumido**

esas gestiones. Además expresó las dificultades que tuvo en reclutar, sin éxito, a otros abogados-notarios. **No se ha cuestionado la veracidad de estas expresiones.**

**Segundo**, la mayoría enfatiza que el PAC no haya obtenido las listas electorales luego de un litigio en que finalmente este foro lo autorizó. (Per Curiam, pág. 7). Otra vez, su abogado explicó que no se hizo ("ha hecho") por el costo que conllevaba $1,800.00, y en espera de que se resolviera este caso. **Para atribuirle falta de diligencia ¿puede en justicia la mayoría del Tribunal tomar como uno de los elementos determinantes la capacidad o no económica para adquirirlas?** El PAC solicitó las listas a la Comisión Estatal desde el 26 de mayo de 1998. En junio dicho organismo se las negó. Subsiguientemente, tanto el Tribunal de Primera Instancia como el Circuito de Apelaciones también se las negaron. No fue hasta el pasado 27 de septiembre de 1999 –mandato remitido el 14 de octubre-, que le reconocimos ese derecho. A esa fecha, estaba pendiente este otro recurso presentado desde el 21 de mayo de dicho año. Dos (2) semanas después del mandato autorizando la entrega de las listas, la mayoría del Tribunal le negó al PAC, en auxilio de jurisdicción, el remedio alterno que pedían de electores notarios ad-hoc. **En estas circunstancias y considerando el costo que representan las listas ¿puede tacharse de irrazonable o estimarse indicativo de desidia la decisión del PAC de posponer su adquisición, hasta tanto se resolviera su planteamiento sobre la inconstitucionalidad del Art. 3.001 de la Ley Electoral?**

**Tercero**, menciona la mayoría ausencia de "pujanza electoral", ya que el PAC no produjo un listado de electores dispuestos a endosarlo. (Per Curiam, págs. 7-8). **¿Desde cuándo existe este requisito en ley? ¡Nunca!**

**Finalmente**, la mayoría señala que la negativa del PAC a considerar y acoger otros funcionarios públicos, como mecanismo alterno para certificar los endosos, es demostrativa de falta de interés en inscribirse. (Per Curiam, pág. 10). **Sobre este particular, tenemos la impresión que se está penalizando al PAC por ejercitar el derecho de pedir un decreto de inconstitucionalidad y, ante el factor tiempo, insistir en el remedio de notarios ad-hoc.**

El reclamo judicial del PAC no puede menoscabarse con la conclusión mayoritaria errónea de que "no ha demostrado una diligencia razonable en la defensa del **interés concreto que pretende litigar**". Tampoco con el aserto de que su "base electoral" es abstracta e hipotética, pues sólo produjo diez (10) declaraciones juradas y, "no nos ha demostrado que cuenta con el apoyo de personas o grupos identificables, lo cual necesita toda agrupación política que aspira a convertirse en un partido político y a presentar candidatos en todo el país." (Per Curiam, pág. 13).

Introduce la mayoría un nuevo requisito **extralegal** para formular reclamos judiciales –que las agrupaciones acrediten ante los tribunales "pujanza electoral"–, **paradójicamente cuando precisamente se cuestionan exigencias que inciden en la forma y manera de demostrar legalmente esa suficiencia de fuerza electoral.** Decimos **extralegal**, pues la Ley Electoral y el Reglamento para la Inscripción de Partidos por Petición sólo exigen de las agrupaciones en proceso de inscripción una **solicitud jurada**, haciendo constar que los solicitantes son electores debidamente inscritos –el nombre y emblema que se proponen utilizar, acompañada de su programa de gobierno–, y los nombres y direcciones de los que constituyan su organismo directivo.

**La "pujanza electoral" bajo la óptica mayoritaria es un**

**criterio adjudicativo extraño y erróneamente a destiempo**. El único apoyo visualizado por la Ley Electoral se demuestra concreta y oportunamente con la muestra porcentual de los electores activos, a saber, una cantidad "no menor del cinco (5) por ciento del total de votos depositados para todos los candidatos al cargo de Gobernador en la elección precedente". **Esa es la "pujanza o fuerza electoral" que la Ley Electoral contempla; ninguna otra podemos tomar en cuenta**. Y ciertamente, para establecerla y evidenciarla, toda agrupación de electores tiene hasta el 31 de mayo, pero con la dificultad actual  -de la cual no podemos abstraernos-, del requisito de juramento individual exclusivo notarial. **No podemos forzar a los electores a cruzar un puente antes de llegar al río**.

Íntimamente relacionado, la mayoría concluye, con vista a las ejecutorias del Partido Renovación Puertorriqueño (PRP) -logró inscribirse para las elecciones generales de 1984-, que las disposiciones impugnadas "no son **tan** onerosas como para imposibilitar que una agrupación política que demuestre un grado de diligencia razonable logre acceso a la papeleta". (Per Curiam, pág. 17; énfasis suplido).

Si algo revela este dato, es lo gravoso del requisito notarial. Según el Informe de Relación de Partidos por Petición suministrado por la propia Comisión Estatal, de las agrupaciones que solicitaron quedar certificadas para comenzar el proceso de inscripción -bajo el requisito de jurat ante notario-, como partidos por petición a nivel isla (ocho en total), **sólo el PRP logró acceso a la papeleta**.

**Adjetivar, sin mayor explicación, la diligencia del PRP como una razonable y conducente a su logro inscripcionario, es abstraerse de las contingencias políticas de aquel momento histórico**. Véase, F. Bayron Toro, Elecciones y Partidos Políticos de Puerto Rico, Ed. Isla, págs. 307-309 (1989).

Aparte de las circunstancias peculiares del PRP, lo cierto es, que el último "nuevo partido político" que pudo, en efecto, participar en unas elecciones generales fue el Partido Socialista Puertorriqueño (PSP), para el año 1980. **Curiosamente, aunque el Art. 3.001 de la Ley Electoral fue enmendado el 15 de noviembre de 1978 –casi dos años exactos antes de las elecciones de noviembre de 1980–, para incluir el requisito de exclusividad individual notarial, éste no fue exigido a las agrupaciones que buscaron inscribirse para esos comicios, debido a su "proximidad". El dato es sumamente revelador y habla por sí solo.**

Luego de entrar en vigor el requisito de exclusividad notarial, los tres partidos políticos principales– Partido Nuevo Progresista, Partido Popular Democrático y Partido Independentista Puertorriqueño– exitosamente han podido dejar fuera otros movimientos políticos-sociales.

> "Aunque los **esfuerzos previos realizados** por partidos por petición y candidatos independientes para cumplir con los requisitos estatutarios de acceso a la papeleta son evidencia del oneroso efecto del estatuto, esas consideraciones no deben, de forma concluyente, determinar la validez de requisitos de inscripción. Un diligente –o rico– partido o candidato puede recoger un extraordinario número de firmas, pero la recolección de por sí no significa que el estatuto es constitucional. **Sobreenfatizar ejecutorias previas tiende a penalizar al candidato que cuestiona la constitucionalidad de los requisitos y, al mismo tiempo, trata de cumplir con la ley**....Por consiguiente, el que otros candidatos en el pasado hayan satisfecho requisitos para acceso a la papeleta, sólo debe ser de relevancia nominal, al considerar la constitucionalidad de un estatuto." Note, <u>Nominating Petition Requirements for Third-Party and Independent Candidate Ballot Access</u>, 11 Suffolk U. L. Rev., 974, 990 (1977).

IV

¿Cuáles son los antecedentes históricos-legislativos del requisito de exclusividad notarial? ¿Es realmente una tradición?

Un peregrinaje iniciado desde la primera Ley Electoral Núm. 79 de 25 de junio de 1919 –por la ruta de la Ley Núm. 2 de 18 de junio de 1924, la Ley Núm. 3 de 5 de octubre de 1965, el Código Electoral de 1974 y, terminado en la Ley Electoral de 1977–, **derrota contundentemente la conclusión legislativa y existencia de una exclusividad notarial tradicional.**

Así, en su origen, bajo la Sec. 37 Ley Núm. 79 de 1919, los electores endosantes juraban declaración **"ante algún funcionario autorizado por ley para tomar juramentos"**. Ello incluía a todos los jueces y, obviamente, a los notarios públicos que estuvieran dispuestos a hacerlo. El proceso era tan rápido y sencillo que no era necesario presentar una declaración jurada por separado para cada firmante: la certificación del funcionario cubría a todos.[14]

**La posible intervención de un notario duró escasamente cinco (5) años.** En el 1924 se eliminó su participación y dispuso que el endoso fuera **"ante un <u>funcionario judicial</u> de Puerto Rico autorizado para tomar juramentos"**, esto es, los miembros de la judicatura. Se exigió un certificado separado para cada juramento y firma.[15] Luego, en 1961 la fraseología cambió y dispuso que la petición fuera firmada frente al Presidente de la Junta Local de Elecciones, jueces superiores, de distrito o de paz. **Continuaron excluidos los abogados-notarios.** Cuatro (4) décadas más tarde del 1924, en el año 1965, se añadió y mencionó expresamente, **por primera vez, al notario que acepta ser nombrado por la Junta Estatal de Elecciones.**

---

[14] Este texto se mantuvo inalterado en las Leyes Núms. 15 y 74 de 12 de mayo de 1920 y 30 de julio de 1923, respectivamente.

[15] Estas disposiciones permanecieron igual en las Leyes Núms. 74, 114, 10, 87, y 1 de 6 de julio de 1932, 29 de junio de 1936, 18 de agosto de 1952, 20 de junio de 1955 y 2 de septiembre de 1955, respectivamente.

La lección es clara. Por más de sesenta (60) años prevaleció un esquema legislativo amplio, libre de trabas y claramente accesible a los electores del país quienes podían ir ante los Jueces y Presidentes de Juntas Locales. Por la naturaleza pública de funcionarios públicos, no cabe

La lección es clara. Por más de sesenta (60) años prevaleció un esquema legislativo amplio, libre de trabas y claramente accesible a los electores del país quienes podían ir ante los Jueces y Presidentes de Juntas Locales. Por la naturaleza pública de funcionarios públicos, no cabe

duda de que éstos tenían que cumplir con ese deber ministerial. **El notario público era una alternativa más: no había necesidad de acudir ante éstos.**

**Este diseño legislativo abierto quedó cerrado en el año 1978, al establecerse el monopolio notarial para la inscripción de nuevos partidos.** El legajo legislativo revela que se impuso para supuestamente superar una "omisión involuntaria" ocurrida durante la aprobación de la Ley Electoral de 1977, consistente en que no se proveyó para la juramentación de peticiones de inscripción de partidos políticos. Se justificó a base de la visión legislativa errónea de "cumplir con una tradición en nuestro proceso de inscripción de partidos por petición". (<u>Informe Cámara de Representantes, 24 de octubre de 1978</u>).

Distinto a esa percepción legislativa, hemos visto que **nunca existió "tradición de exclusividad notarial"** hasta que fue impuesta en el 1978. **La realidad histórica siempre fue de más amplio acceso a través de funcionarios judiciales, electorales y, por poco tiempo, notarios públicos "voluntarios".**

Decimos notarios **"voluntarios"** pues esa fue la práctica que prevaleció durante el brevísimo periodo en que la Ley Electoral los autorizó. Permitió, como complemento a los jueces y presidentes de las juntas locales, que en las etapas iniciales de formación las agrupaciones reclutaran notarios simpatizantes identificados ideológicamente con sus idearios y programas, **los cuales voluntariamente ofrecieron sus servicios y obtuvieron nombramientos de la Junta Estatal.**

Al eliminarse la oportunidad del juramento ante jueces y funcionarios electorales, desde el año 1978 la Asamblea Legislativa creó **la barrera infranqueable del monopolio electoral notarial.** Le impone a los electores endosantes la

obligación de notarizar sus firmas, sin embargo, no obliga a ningún notario —como tampoco la Ley Notarial— a hacerlo. Se descansa en la sola voluntariedad y discrecionalidad de los abogados-notarios para hacer valer sus derechos. **El Estado no ofrece funcionarios, mecanismos o remedios alternos para autenticarlas en caso de que se nieguen.** Exige el requisito de endoso único ante notarios pero, paradójicamente, permite que su implantación descanse en la premisa de que "voluntariamente" realizarán esta función.

La mayoría, vía escolio, simplifica y no ve dificultad alguna a esas gestiones notariales para las cuales afirma, las agrupaciones "pueden valerse de diversos métodos: pueden enviar o llevar a los electores a las oficinas de los notarios; pueden tener un notario que los acompañe en sus campañas de recolección de endosos; pueden localizarse en lugares estratégicos y de acceso público con personal que lleve el mensaje político y solicite los endosos y simultáneamente tener notarios que juramenten los endosos etc." (Opinión <u>Per Curiam</u>, pág. 16, escolio 7).

**Si algo demuestran estas "gestiones", es el estado de dependencia notarial.** En su aplicación viva, el requisito de juramentación de endosos exclusivamente ante notarios significa que un movimiento en gestación, tendrá primero que convencer a un sector considerable de la ciudadanía a que consigne su firma para endosar la inscripción del nuevo partido político. Después, apelar a la función social del notariado, persuadir y lograr que ese **sub-grupo** de ciudadanos —clase profesional única que ostenta una licencia para practicar la notaría—, discrecionalmente decida ofrecer el servicio de autenticar las firmas de los endosantes siguiendo algunos de los "métodos" que expone el tribunal y luego radicar los cuatro (4) informes pertinentes, todo por el

honorario nominal de un dólar. **Si bien hay que convencer a unos, a otros habrá que convencerlos doblemente. Bajo la óptica mayoritaria ¿apoyo electoral o notarial?**

V

Hablamos de **convencer**, no obligar a los notarios, pues el Art. 3 de la Ley Notarial vigente –Núm. 75 de 2 de julio de 1987–, les otorga total autonomía en el descargo de sus funciones. Reza: "[e]l notario estará autorizado para ejercer su función en todo el Estado Libre Asociado de Puerto Rico. En tal función **disfrutará en plena autonomía e independencia**, la ejercerá con imparcialidad y estará bajo la dirección administrativa del Tribunal Supremo." (Énfasis suplido).

La Ley Notarial anterior –Núm. 99 del 27 de junio de 1956–, no hacía mención a dicha autonomía. Sobre su significado y alcance no hemos tenido oportunidad de expresarnos. Podríamos aventurarnos a sugerir que se remite al principio clásico de voluntariedad en la contratación.

No escapa nuestra consideración que **los notarios no son funcionarios públicos**, sino profesionales de Derecho –Pueblo v. Central Cambalache, 62 D.P.R. 553 (1943)–, que ejercen una función pública, esto es, autorizados para dar fe y autenticidad a los negocios jurídicos y demás actos y hechos que ante él se realicen. Ley Notarial, Art. 2.

Ciertamente cuando un notario discrecional y voluntariamente opta por solicitar y obtener un nombramiento de la Comisión Estatal para autenticar estos endosos –retribuidos a razón de un dólar cada uno–, pudiera argumentarse que ese nombramiento les confiere condición limitada de funcionario público de la Comisión Estatal y queda entonces obligado a realizarla. Ahora bien, el problema es que esa exigencia no la requiere la Ley Electoral ni la Ley Notarial. **Acaso la mera mención legislativa de que el jurat**

sea ante abogados-notarios ¿implica una metamorfosis <u>de iure</u> e investidura de funcionarios públicos que los obliga a cumplir una función cuasi-electoral? Como novedosa inventiva legislativa ¿emerge la figura de notarios de oficio?

Cabe resaltar y distinguir una vez más la naturaleza y la dinámica práctica del notario latino <u>vis à vis</u> el notario público anglosajón. Éstos no tienen las mismas responsabilidades éticas, fedatarias y secretariales de los notarios puertorriqueños. Su desempeño notarial es a menudo incidental o secundario a una profesión o empleo distinto. La recolección de firmas -activamente, al acudir directamente a los posibles endosantes, o pasivamente, al hacerse disponible casi exclusivamente para que los signatarios acudan ante él para autenticar sus firmas-, no resulta particularmente difícil para un ciudadano que sólo incidentalmente es notario público el dedicarse a la búsqueda de endosos. Ahora bien, como lo estableció el PAC, ante el Tribunal de Primera Instancia en sus alegaciones iniciales **no controvertidas** -subsiguientemente, mediante afidávits de electores y abogados-notarios que acompañó en su moción de reconsideración y en la vista oral-, la disponibilidad es mínima. **Se probó que es muy dificultoso y económicamente gravoso para los abogados-notarios en nuestra jurisdicción dejar su práctica profesional, imbricada de serias responsabilidades éticas, para hacerse recolector de firmas por un dólar.**

Por otro lado, si se les obligara, a menos de seis semanas de la fecha límite (31 de mayo) para el PAC presentar 97,874 endosos, ¿cuáles criterios y quién seleccionará a esos notarios? ¿Estarán sólo sujetos los que se desempeñen en la práctica privada? ¿Se incluirán a los que laboran en el gobierno, agencias y otras entidades públicas? ¿Qué horario se les exigirá? ¿Puede compelérsele a trasladarse fuera de sus

oficinas? ¿Se les impondrá una cuota numérica mínima de juramentos? ¿Qué de los notarios que por razones de sus otros deberes profesionales y clientes, como abogados, tengan conflictos y se opongan a notarizar una firma para endosar al PAC u otra de las agrupaciones partidistas que están en el mismo proceso? Si la oposición es por razón de no creer en el nuevo movimiento o estar vinculados ideológicamente a los partidos principales existentes ¿acaso son "objetores por conciencia"? Ramírez de Ferrer v. Mari Brás, res. en 18 de noviembre de 1997, 144 D.P.R. ____ (1997), Opinión Concurrente, Juez Asociado, señor Negrón García. ¿Qué remedio tienen los electores rechazados por el notario? ¿Radicar una queja ante este Tribunal por falta ética?

Si el autenticar la firma es deber ministerial, ¿tendrán los electores que solicitar un mandamus para obligarlos? ¿Qué criterios, entonces, utilizaremos para eximir a determinados notarios de esta nueva obligación? ¿No está el Estado erigiendo trabas y obstáculos permanentes impermisibles?

La lista de estas interrogantes no es exhaustiva; ponen de manifiesto que la posible alternativa de obligar legislativa o judicialmente a los abogados-notarios del país a realizar esta función electoral como remedio a la inconstitucionalidad del estatuto, ciertamente plantea más interrogantes jurídicas y crea mayores dificultades prácticas de las que resuelve.

## VI

Hemos visto que, de su faz y operacionalmente, bajo nuestra Constitución y **escrutinio estricto judicial**,[16] estamos

---

[16] El estándar de revisión aplicado por la Corte Suprema federal a los casos de acceso de candidatos y partidos políticos a la papeleta es casuístico en extremo y carece de un criterio único o un acercamiento sistemático al problema.

ante un esquema restrictivo, oneroso, discriminatorio e impermisible.

**Nuestra doctrina jurisprudencial es abundantemente generosa en la interpretación de los derechos electorales; no debemos abandonarla.** Como previamente dijéramos en este caso, "[l]a visión amplia de nuestra democracia significa que el ejercicio al sufragio no sólo implica acceso individual a las urnas sino que -con sujeción a ciertas limitaciones razonables necesarias-, se incluyan en las papeletas opciones que reflejen las ideas y concepciones del elector de una sociedad pluralista. A su vez, la libertad de asociación conlleva el derecho a formar agrupaciones y proponer candidatos de su

---

"Así, la Corte parece estar comprometida a una revisión judicial independiente de restricciones a candidatos a través de un examen de balance [de intereses] un tanto indefinido que sopesa la restricción a las libertades del votante bajo la primera y decimocuarta enmiendas contra el interés del Estado en ayudar a la población a tener suficientes elecciones para la selección de oficiales públicos. La Corte también examinará los conflictos entre el derecho estatal y la reglamentación de los partidos políticos en cuanto a la elegibilidad de personas a participar en elecciones primarias como votantes o candidatos para [así] determinar si el Estado está interfiriendo inconstitucionalmente con el derecho de asociación de [aquellas] personas que se han unido para formar un partido político." Ronald D. Rotunda y John E. Nowak, Treatise on Constitutional Law (3ª edición, 1999), págs. 710-711. (Traducción nuestra).

El criterio principal en cuanto al nivel de escrutinio a aplicarse a un estatuto limitativo de la inscripción de un candidato o partido es la severidad de la restricción impuesta a la capacidad del votante de ejercer una opción electoral, o al derecho ciudadano de asociarse y expresarse libremente sobre asuntos políticos. En estos casos se aplicará el escrutinio estricto.

Si, por el contrario, los derechos de expresión y asociación de los ciudadanos o la libre opción política del votante no se ven significativamente afectadas, sólo se hará un balance de intereses. Id. págs. 711-712. Al amparo de la Constitución federal, no se activa el escrutinio estricto de forma automática en casos de acceso a la papeleta, pues no existe un derecho a ser candidato enunciado allí de forma explícita. Id. pág. 706. Por lo tanto, el acceso a la papeleta se fundamenta indirectamente en otros derechos, como las libertades de expresión y asociación y el derecho al voto.

predilección para participar en el proceso electoral. P.S.P. v. C.E.E., 110 D.P.R. 400 (1980); García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49 (1976)." Partido de Acción Civil v. E.L.A., res. en 27 de octubre de 1999, 99 TSPR 163, Voto disidente, Juez Asociado, señor Negrón García.

Por su naturaleza, la inscripción de un partido político por petición en Puerto Rico, es **indistinguible** de la práctica de propulsar legislación particular por endosos en las jurisdicciones estadounidenses en la que esta se permite. **Sustantivamente, los derechos de libre expresión, asociación y sufragio envueltos son los mismos y persiguen idéntico propósito: forzar la discusión pública, sea de un asunto singular, en el caso de una propuesta de legislación, sea de un programa, una filosofía política o un conjunto de principios, en el caso de la formación de un partido.** En su esencia, procesalmente, ambas utilizan el mismo método: la circulación de formularios de endoso en los que los electores como ciudadanos particulares, estampan sus firmas para expresar su acuerdo con la inclusión del partido o la legislación propuesta en la papeleta. **Los partidos políticos, al igual que las propuestas populares de legislación, se inscriben mediante formularios de endoso.** No cabe diferenciar –por sutilezas casuísticas– dos prácticas que, en su sustrato jurídico, operación y mecanismo, son indistinguibles.

Es cuestionable pues, por no decir errónea, la distinción mayoritaria (Per Curiam, págs. 13-17), que rechaza el valor persuasivo de los casos de Meyer v. Grant, 486 U.S. 414 (1987) y Buckley v. A.C.L.F., 525 U.S. 182 (1999), invocados por el PAC. La mayoría ignora que ambos validaron un requisito de afidávit **completamente distinto** al ordenado individual y solamente ante notario por el Art. 3.001(3) de nuestra Ley Electoral. **Allá, la legislación exigía que el recolector de**

**firmas para la petición o propuesta circulada, jurase ante notario que todas las firmas en su lista se habían obtenido legalmente. Éste requisito, razonable por más, dista mucho del que cada firma en una petición esté notarizada individualmente, como de manera onerosa, sin ninguna otra alternativa, exige nuestra legislación.**

No obstante, la mayoría concluye que distinto a esos casos, la norma de exclusividad notarial no restringe la libertad de expresión de los electores miembros del PAC, pues no limita en nada que "las personas que pueden llevar el mensaje político esbozado por dicho partido para convencer a ciudadanos inscritos a endosar las peticiones de inscripción, ni quienes pueden actuar como recolectores de endosos." (Per Curiam, págs. 14-15). A juicio suyo, están en plena libertad de expresión, difundir sus mensajes por cualesquiera medios, comunicarse directamente, solicitando apoyo y pedir a los electores que lleven las peticiones de endoso. **Acepta, sin embargo, que las peticiones y firmas de los electores tienen que ser individualmente validadas sólo ante notarios.** (Id., pág. 16). El prisma mayoritario desatiende una realidad inicial: que el resultado, valor y eficacia de las – inscripciones electorales, producto del ejercicio del derecho a la libre expresión y el mensaje previo de los electores, **depende y queda subordinado a que los abogados-notarios del país la configuren validamente en afidávits individuales.**

**Con el requisito de exclusividad notarial en la autenticación de las firmas en los endosos electorales, el Estado ha establecido un diseño que delega y deja a la sola voluntad de los abogados-notarios la inscripción misma de cualquier partido político nuevo. En sus manos está, pues son los únicos autorizados a ejercer esa función; nadie más puede, en Ley, hacerlo. Para entrar en la arena y lograr una**

**franquicia electoral, sólo hay una puerta cuya llave la tiene guardada un grupo profesional que no está obligado a usarla, no empece las genuinas intenciones de un partido incipiente a aportar otras ideas o concepciones a nuestra sociedad pluralista; incluso contrario a la voluntad y derecho de un ciudadano que desea plasmar su firma en una hoja de endoso.** Se coarta, pues, no sólo el derecho del movimiento a entrar al campo político-electoral, sino también el del ciudadano a hacer constar su endoso y oportunamente darle efectos políticos y jurídicos prácticos a su voto.

**En nuestra democracia, la Asamblea Legislativa tiene, con ciertas limitaciones, amplia facultad para pautar todo lo concerniente a las elecciones. Una de ellas es que no puede directa o <u>indirectamente</u> elevar a categoría de virtud el sistema y continuismo de los tres grandes partidos ideológicos mediante el establecimiento de restricciones irrazonables al nacimiento de nuevos. La exigencia de endosos solamente ante abogados-notarios es un ejemplo más de PARTIDOCRACIA inconstitucional.**

## VII

La vía judicial del PAC para superar y terminar el gravoso esquema legislativo del monopolio notarial electoral ha sido lenta, difícil y cuesta arriba. Comenzó con su impugnación el 6 de octubre de 1998 ante el Tribunal de Primera Instancia al presentar un injunction y decreto declarativo. No tuvo éxito. Luego apeló y el Tribunal de Circuito de Apelaciones confirmó. El 21 de mayo de 1999, tocó las puertas de este foro, y como indicáramos antes, el 27 de octubre de 1999, por votación dividida -con el disentir de la Jueza Asociada señora Naveira de Rodón, Juez Asociado señor Fuster Berlingeri y el que suscribe-, se les negó remedio alterno expedito en auxilio de nuestra jurisdicción. En ese

momento la mayoría no acogió nuestra propuesta remedial rápida, económica y menos onerosa, –igualmente garante contra el fraude–, de autorizar que los endosos fueran "también ante los funcionarios de las Juntas de Inscripciones Permanente de cada Municipio". El 25 de febrero de 2000, por Opinión igualmente dividida, el Tribunal confirmó la desestimación del <u>mandamus</u>. En esa ocasión, ante el reiterado rechazo mayoritario a nuestra posición de autorizar los endosos ante los funcionarios de las Juntas de Inscripciones Permanentes, **por imperativo jurídico la tachamos de inconstitucional.**

Al día de hoy, nadie puede negar seriamente que continuar exigiéndole al PAC solamente endosos ante notarios le imposibilita inscribirse en o antes del próximo 31 de mayo.

**En estas circunstancias, sin ulterior demora, como único remedio judicial inmediato autorizaríamos al PAC a reclutar y, ordenaríamos a la Comisión Estatal de Elecciones a activar, el método de notarios <u>ad hoc</u> dispuesto por el Art. 4.011 de la Ley Electoral.**

**"<u>Tempus fugit</u>" (El tiempo vuela).**

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado